**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Roy A. BARTEE, Defendant-Appellant.**

**No. 72–1759.**

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Feb. 21, 1973.

Decided May 22, 1973.

Rehearing Denied June 14, 1973.

Paul D. Cooper, Asst. U. S. Atty. (James L. Treece, U. S. Atty., on the brief), for plaintiff-appellee.

Hugh J. McClearn, Denver, Colo. (Gregory A. Thomas, Boulder, Colo., and

Van Cise, Freeman, Tooley & McClearn, Denver, Colo., on the brief), for defendant-appellant.

Samuel P. Guyton and Eugene F. McGuire, Denver, Colo., and Holland & Hart, Denver, Colo., of counsel, for The Denver Medical Society, as amicus curiae..

Before SETH, McWILLIAMS and DOYLE, Circuit Judges.

McWILLIAMS, Circuit Judge.

Dr. Roy A. Bartee, a licensed doctor of medicine, was convicted on two counts of dispensing a controlled substance in violation of 21 U.S.C. § 841(a)(1). In one count, Dr. Bartee was convicted of knowingly and intentionally dispensing Percodan on February 29, 1972, to Ronald Baker, a special agent with the Federal Bureau of Narcotics and Dangerous Drugs, which agency will hereinafter be referred to as BNDD. In another count, Dr. Bartee was convicted of knowingly and intentionally dispensing Seconal on March 2, 1972, to William Coller, also a special agent for BNDD. Dr. Bartee was acquitted on a third count involving a Denver policewoman who visited him and for whom he had allegedly prescribed Percobarb and Dexamyl.

Dr. Bartee now appeals his conviction and in our view his principal assignment of error relates to the sufficiency of the evidence. Accordingly, we will summarize the evidence in some detail, keeping in mind that, Dr. Bartee having been convicted, we must on appeal view the evidence, together with all the reasonable inferences that can be drawn therefrom, in a light most favorable to the Government. United States v. Frazier, 434 F.2d 238 (10th Cir. 1970).

On February 14, 1972, agent Ronald Baker first visited Dr. Bartee in the latter's office located at 811 South Pearl Street in Denver, Colorado. Baker, using a cover name of Tony Morris, complained to the doctor of a persistent backache. The doctor, without conducting any physical examination, as such, though he did take a short history, wrote out a prescription for Parafon-forte, which is not a controlled substance.

On February 29, 1972, Baker returned to Dr. Bartee, advising him on that occasion that he needed something stronger than Parafon Forte. As concerns the Parafon Forte previously prescribed, Baker informed the doctor that he had traded some of it for some Tuinal, which is a controlled substance. Dr. Bartee then advised Baker that he would prescribe something stronger and began writing out a prescription for twenty-four tablets of Percodan, which is a controlled substance. Baker asked for a larger prescription and the doctor accordingly gave Baker three separate prescriptions, each calling for twenty-four Percodan tablets, with two of the prescriptions being postdated, one to March 4, 1972, and another to March 8, 1972.

On March 7, 1972, Baker returned to Dr. Bartee's office for a third time. On this occasion, Baker told the doctor that he had been selling the Percodan previously prescribed, whereupon Dr. Bartee stated that he would not do any further business with Baker and walked out of the office. The foregoing summarizes the contacts between Baker and Dr. Bartee. As stated above, one count was based on Dr. Bartee's prescribing Percodan for Baker on February 29, 1972. Let us now turn to agent Coller's visitations to Dr. Bartee's office.

On February 4, 1972, agent William Coller, using the cover name of Bill Conan, first visited Dr. Bartee, complaining of nervousness and inability to sleep. After taking a brief history and making no physical examination, the doctor prescribed Librium, which is said to be a noncontrolled substance.

On February 28, 1972, Coller returned to Dr. Bartee and told him that he (Coller) had traded the Librium for Seconal, which he called "reds," because the Librium hadn't helped him any. On this occasion, Dr. Bartee gave Coller a quantity of the drug Triavil, as opposed to writing out a prescription.

On March 2, 1972, Coller again visited Dr. Bartee and insisted on being given some "reds," a slang term for Seconal. As concerns the Triavil, Coller told the doctor that he had used some, and sold the rest. Dr. Bartee on this occasion told Coller that Seconal was a powerful narcotic and wasn't normally prescribed for simple nervousness. Coller insisted and the doctor wrote out a prescription for Seconal, with Coller paying for the office call with a radio.

On March 9, 1972, Coller next visited Dr. Bartee, asking for more "reds." Dr. Bartee indicated he had given Coller plenty of Seconal on the earlier visit and asked what Coller had done with the Seconal thus prescribed. Coller informed the doctor that he had used some, and gave the rest to his roommate. Dr. Bartee said he had to be "careful" since the BNDD from time to time checked the records of drugstores to determine which doctors were prescribing drugs. In response thereto, Coller stated that he would get the prescriptions filled out of Denver, if that would help, to which the doctor replied that such wasn't necessary, with the further admonition that "if you'll just take the prescriptions to different drugstores each time, that should be all right." On this occasion, Dr. Bartee gave Coller one prescription for twenty-four Seconal tablets, and a second prescription, post-dated, for twenty-four more Seconal tablets.

On March 21, 1972, Coller made his final visit to Dr. Bartee and said he needed some more "reds." Coller informed the doctor that he had traded some of the Seconal for other drugs. On this occasion, Coller got another prescription for twenty-four Seconal tablets. He also got a second prescription, bearing the same date as the first, for an additional twenty-four Seconal tablets, on the pretext that he was leaving town and needed a larger prescription.

As concerns this second prescription given Coller by Dr. Bartee on March 21, 1972, there was a dispute between Coller and Dr. Bartee as to the reason for such. Dr. Bartee testified that Coller came back in the afternoon claiming that he had lost the prescription given him during the morning of that day and that this precipitated the giving of a second prescription on the same day. As indicated, Coller testified that he got both prescriptions at the same time. Coller's version was pretty well corroborated by another agent of BNDD and by the druggist who filled both prescriptions, to the end that Dr. Bartee on sur-rebuttal testified that the "lost" prescription episode might well have not occurred on March 21, 1972, but possibly on March 9, 1972.

The foregoing summarizes the extent of Coller's contacts with Dr. Bartee. As indicated, one count was based on the prescription given Coller by Dr. Bartee on March 2, 1972, for Seconal. However, Coller's testimony regarding his visits to Dr. Bartee of February 4, 28, and March 9 and 21 was admitted on the basis that evidence of such other transactions was admissible for the purpose of proving a common plan, scheme or design on the part of Dr. Bartee to commit the offense charged, or for the purpose of proving motive, opportunity, intent, knowledge, or absence of mistake. United States v. Burkhart, 458 F.2d 201 (10th Cir. 1972). For like reason, Baker's testimony as to each of his several visits to Dr. Bartee was received into evidence. Before considering Dr. Bartee's argument as to why his convictions should be reversed, reference will first be made to various statutes which bear on the controversy.

Section 841(a)(1), 21 U.S.C. provides that it is unlawful for any person to knowingly and intentionally dispense a controlled substance, except as authorized by the subchapter. Section 802(10), 21 U.S.C. defines the word "dispense" as follows:

"The term 'dispense' means to deliver a controlled substance to an *ultimate user* or research subject by, or pursuant to the lawful order of, a practitioner, including the *prescribing*

*and administering* of a controlled substance and the packaging, labeling, or compounding necessary to prepare the substance for such delivery. * * *" (Emphasis added.)

The italicized portions of the foregoing will be discussed, *infra.*

The word "administer" is defined in 21 U.S.C. § 802(2) as follows:

"The term 'administer' refers to the direct application of a controlled substance to the body of a patient * * * by—.

(A) a practitioner (or, in his presence, by his authorized agent), or

(B) the patient * * * at the direction and in the presence of the practitioner,

whether such application be by injection, inhalation, ingestion, or any other means."

The term "ultimate user" is defined in 21 U.S.C. § 802(25) as follows:

"The term 'ultimate user' means a person who has lawfully obtained, and who possesses, a controlled substance for his own use or for the use of a member of his household or for an animal owned by him or by a member of his household."

Section 829(a) and (b), 21 U.S.C., and 21 C.F.R. § 306.04(a) exempt medical practitioners from the prohibitions of 21 U.S.C. § 841(a)(1) whenever such a practitioner issues a prescription for a legitimate medical purpose and in the usual course of his professional practice.

Viewing the evidence then in the light of the foregoing statutes, it is agreed that Percodan and Seconal are controlled substances. It is undisputed that Dr. Bartee prescribed Percodan and Seconal for Baker and Coller respectively. It is further agreed that the prescriptions thus given Baker and Coller were filled by a druggist, but were never used by either Baker or Coller, and, on the contrary, were turned over to BNDD as evidence. Finally, it is agreed that Dr.

Bartee only prescribed, and did not himself administer to either Baker or Coller.

Dr. Bartee first contends that even though the evidence be viewed in a light most favorable to the Government, the facts and circumstances of the instant case do not measure up to the requirements of the statute in two particulars: (1) Baker and Coller were not "ultimate users" as that term is used in the statute; and (2) Dr. Bartee did not "prescribe" *and* "administer" as is said to be required by the statute. We do not agree.

██ It is true that 21 U.S.C. § 802 requires that the controlled substance be dispensed to an "ultimate user," as the statutory definition of "ultimate user" has been set forth above. Counsel argues that Baker and Coller were not ultimate users because neither used nor ever intended to use the controlled substance, but, on the contrary, merely turned over the prescription, and the controlled substance issued pursuant thereto, to the BNDD for evidence. In this connection it is further asserted that this requirement that the controlled substance be given to one for his own use is a built-in protection against the use of Government agents to "set-up" unsuspecting medical practitioners. In our view, if Congress desired to outlaw the use of Government agents in drug cases, it would have done so in clear and understandable language and not in this oblique way. We do not agree that in order for one to be deemed an ultimate user he must in fact ingest the drug, or that there must be an intent to use the drug when it is obtained. The statute only requires that he *obtain* the drug for his own use, and not that he must in fact use it.

██ Nor do we agree with the argument that the statute requires that a medical practitioner, such as Dr. Bartee, not only "prescribe," but also "administer," if he is to be deemed in violation of the statute. As indicated above, 21 U.S.C. § 802(10), as it defines the word "dispense," states that dispensing means

to deliver a controlled substance, which includes "the prescribing and administering of a controlled substance." Counsel argues that the omission of the article "the" before the word "administering" indicates that the phrase is not to be construed in the disjunctive and that a doctor who merely prescribes, and does not thereafter administer, does not violate the statute, even though the prescription given is filled by the druggist, as is true in the instant case. We do not agree with this reasoning. Any doubt as to legislative intent in this regard is cleared up, we believe, by 21 U.S.C. § 829(a) and (b) and 21 C.F.R. § 306.04.

█ In the first place, 21 U.S.C. § 841(a)(1) makes it unlawful for anyone to dispense a controlled substance unless specifically authorized by other provisions in the subchapter. Both sides agree that the provisions exempting medical practitioners are found in 21 U.S.C. § 829(a) and (b) and 21 C.F.R. § 306.04. And counsel for Bartee concedes in his brief that under that particular statute and regulation medical practitioners are exempt from the prohibition against dispensing controlled substances, "whenever such a practitioner issues a prescription for a legitimate medical purpose and in the usual course of his professional practice." We agree with this analysis. And the converse of that proposition is equally clear and inescapable, namely, that when a medical practitioner issues a prescription which is *not* for a legitimate medical purpose and is *not* in the usual course of his professional practice, then he does violate the statute. In the instant case, Dr. Bartee prescribed, the prescription was filled, and the fact that the doctor did not thereafter administer we deem to be of no moment. By prescribing, the doctor set in motion the chain of events which culminated in a controlled substance being actually dispensed by the druggist. In this regard, see the somewhat analogous cases where it was held that the fact that a physician merely wrote prescriptions for patients did not prevent conviction of the physician for illegal selling of narcotics. Jin Fuey Moy v. United States, 254 U.S. 189, 41 S.Ct. 98, 65 L.Ed. 214 (1920); United States v. Bloom, 164 F.2d 556 (2d Cir. 1947), cert. denied, 333 U.S. 857, 68 S.Ct. 726, 92 L.Ed. 1137 (1948); United States v. Brandenburg, 155 F.2d 110 (3d Cir. 1946), cert. denied, 332 U.S. 769, 68 S.Ct. 80, 92 L.Ed. 354 (1947); and United States v. Abdallah, 149 F.2d 219 (2d Cir. 1945), cert. denied, 326 U.S. 724, 66 S.Ct. 29, 90 L.Ed. 429 (1945).

To us, the real issue in the case relates to the sufficiency of the evidence. The summary set forth above of course puts the Government's evidence in its best light. Dr. Bartee's version of his various encounters with Baker and Coller differed from their version in substantial particulars. Of course such only posed a factual dispute to be resolved by the jury, not us.

█ Dr. Bartee called several fellow doctors who testified that in their expert opinion Dr. Bartee in prescribing Percodan for Baker and Seconal for Coller was, under the circumstances described, acting for a legitimate medical purpose and in the usual course of his professional practice. The Government in its case in chief also called a medical doctor who, though a bit reluctant, gave his opinion on this matter. In the course of his testimony this witness testified, for example, that he knew of no legitimate medical purpose for issuing two prescriptions, instead of one, and that doctors were not supposed in any event to recommend where their patients should get their prescriptions filled. Expert testimony from medical practitioners is of course admissible as bearing on the issue as to whether a doctor in prescribing a controlled substance is acting for a legitimate medical purpose, and the expert testimony in the instant case was to some degree, at least, in conflict. However, the jury is not bound by such expert testimony and may of course consider all of the facts and circumstances surrounding the prescribing as related by lay witnesses. In this connec-

tion, we regard certain of the utterances attributed to Dr. Bartee by Baker and Coller to be particularly damning and the overall facts and circumstances of the case are such as in our view permit the inference that Dr. Bartee in thus prescribing was not acting for a legitimate medical purpose and such was not within the usual course of his professional practice.

In the first place, Dr. Bartee made no physical examination, as such, before prescribing a controlled substance. Additionally, Dr. Bartee knew that both Baker and Coller were prone to trade or otherwise dispose of the drugs prescribed for them by the doctor. In this setting, Dr. Bartee then prescribed inordinately large quantities of controlled substances, and tried to "spread" them out by writing two or three separate prescriptions in place of one, and by postdating the additional prescriptions. In this connection, there was evidence that within one twenty-day period up to 120 days' worth of Seconal was prescribed for agent Coller. The fact that agent Coller used a slang term for Seconal, namely "reds," in his conversations with Dr. Bartee would tend to put him on notice that this was perhaps not the normal patient-physician relationship. Perhaps the most damning evidentiary matter was the testimony by agent Coller that Dr. Bartee said that he had to be careful since the BNDD checked the drugstores for prescriptions issued, to which Coller volunteered to get his prescriptions filled out of Denver; the doctor then responded that such wouldn't be necessary if the prescriptions were taken to different drugstores, and not all filled at the same one. Without going into further detail, the totality of the evidence is such as to permit the jury's determination that Dr. Bartee in prescribing Percodan for agent Baker and Seconal for agent Coller was not acting for a legitimate medical purpose and was not acting in the usual course of his professional practice. For cases where drug convictions of medical doctors have been upheld involving certain of the factors listed above, *see* United States v. Warren, 453 F.2d 738 (2d Cir. 1972), cert. denied, 406 U. S. 944, 92 S.Ct. 2040, 32 L.Ed.2d 331 (1972) ; White v. United States, 399 F. 2d 813 (8th Cir. 1968) ; and Brown v. United States, 250 F.2d 745 (5th Cir. 1958), cert. denied, 356 U.S. 938, 78 S. Ct. 779, 2 L.Ed.2d 812 (1958).

Judgment affirmed.