**UNITED STATES of America,**
**Plaintiff-Appellee,**

**v.**

**Maurice W. ROSENBERG, M.D.,**
**Defendant-Appellant.**

**No. 74–2197.**

United States Court of Appeals,
Ninth Circuit.

March 31, 1975.

Michael D. Nasatir (argued), Beverly Hills, Cal., for defendant-appellant.

Michael Mayoch, Asst. U. S. Atty. (argued), Los Angeles, Cal., for plaintiff-appellee.

## OPINION

Before LUMBARD,* ELY and WRIGHT, Circuit Judges.

LUMBARD, Circuit Judge:

Dr. Maurice .W. Rosenberg appeals from a judgment of conviction entered on April 15, 1974, in the Central District of California, following a jury trial at which he was found guilty of 27 counts of distributing a controlled substance in violation of 21 U.S.C. § 841(a)(1).[1] Dr.

---

* United States Court of Appeals for the Second Circuit, sitting by designation.

1. Twelve of the counts charged the doctor with unlawfully distributing dextroamphetamine

Rosenberg was sentenced to concurrent terms of two years in prison for each violation and was fined $20,000. Imposition of the prison sentences was suspended and payment of the fine was stayed pending appeal. Dr. Rosenberg argues that the statute under which he was convicted is unconstitutional, that there was insufficient evidence to convict him of violating that statute, and that his right against self incrimination was violated. We affirm.

■ Rosenberg was a seventy-five year old doctor who had been practicing medicine in California for approximately 50 years. During 1973 the doctor was visited by five undercover agents working for the California Bureau of Narcotics, Department of Justice, and Department of Consumer Affairs.[2] The investigators used a total of seven names with two agents using the same name.

■ Of course, we review the evidence in the light most favorable to the government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The government established that the following was the mode of operation at Dr. Rosenberg's office: An agent would make an appointment. When he arrived at the office, the doctor's nurse would record his name and address and collect the fee for an office visit. The fee for the first visit was $15 payable in cash; for subsequent visits the charge was $8. The nurse normally took the patient's record into the doctor with the cash clipped to one corner.

At no time did Dr. Rosenberg give any of the agents a physical examination.

The agents never voluntarily indicated that they had any medical problem for which they needed medication. For example, when the doctor asked agent Van Diest what was wrong with her, she said that she did not have any problems, that she had been buying pills on the street and wanted a safer source, and that she had heard that she could get them from him. She told Dr. Rosenberg that she wanted some "reds."[3] When Dr. Rosenberg asked her why she wanted them, Ms. Van Diest said that she just liked taking them. The doctor then indicated that he would only give her a month's supply and that the pills could be dangerous. He then asked her if he could do anything else for her and she replied that she would like some "whites."[4] At this point the doctor asked her if she would like to say that she wanted to lose weight. Ms. Van Diest told him that she really did not care. The doctor replied, "Well, we'll say that you would like to lose weight." Dr. Rosenberg gave Ms. Van Diest a prescription for both seconal and dexedrine. At the time of her visit Ms. Van Diest was five feet, six inches tall and weighed 127 pounds. The doctor gave her no physical examination. The testimony of the other agents was similar to that of Ms. Van Diest.

■ On the basis of the above described evidence, Dr. Rosenberg was charged with violating the federal Controlled Substance Act which provides that

[e]xcept as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—(1) to manufacture, distribute, or dispense, or possess with intent to manufacture,

(dexedrine), a schedule II controlled substance; *nine of the counts charged him with unlawfully* distributing secobarbital (seconal), a schedule III controlled substance; and six of the counts charged him with unlawfully distributing meprobamate (miltown), a schedule IV controlled substance. See 21 U.S.C. § 812.

2. Dr. Rosenberg argues that he was somehow denied due process because the state investigators turned their information over to the United States Attorney. Such a division of

labor is highly desirable so long as it does not deprive a defendant of some constitutional right. There is no suggestion that the California investigators violated Dr. Rosenberg's rights. The doctor was indicted by a grand jury and enjoyed all of the rights and procedural safeguards normally afforded a federal defendant.

3. A street name for seconal.

4. A street name for dexedrine, a drug that can be used for weight reduction purposes.

distribute, or dispense, a controlled substance.

21 U.S.C. § 841(a)(1). Under the statute a "practitioner" is authorized to prescribe controlled substances. 21 U.S.C. § 829(a), (b). "Practitioner" is defined as

a physician, dentist, veterinarian, scientific investigator, pharmacy, hospital, or other person licensed, registered, or otherwise permitted, by the United States or the jurisdiction in which he practices or does research, to distribute, dispense, conduct research with respect to, administer, or use in teaching or chemical analysis, a controlled substance *in the course of professional practice or research.*

21 U.S.C. § 802(20) (emphasis added). We interpret this combination of sections 802(20), 829, and 841 to mean that a doctor who acts other than in the course of professional practice is not a practitioner under the Act and is therefore not authorized to prescribe controlled substances. Such a physician is therefore subject to the criminal provisions of the Act contained in section 841(a)(1). Accord, United States v. Badia, 490 F.2d 296, 298 (1st Cir. 1973); United States v. Jobe, 487 F.2d 268, 269 (10th Cir. 1973), cert. denied, 416 U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305 (1974); United States v. Collier, 478 F.2d 268, 271–72 (5th Cir. 1973) ("It is apparent that a licensed practitioner is not immune from the act solely due to his status, . . . but rather, because he is expected to prescribe or dispense drugs within the bounds of his professional practice of medicine.") This same interpretation of the Act was made by the Attorney General:

A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.

21 C.F.R. § 1306.04(a) (1974).

Our dissenting brother describes the language of section 802(20) as "vague."

However, the terms contained in that section are not vague; courts have often defined the phrase "in the course of professional practice." See pages 197–198 *infra.* Judge Ely's vagueness argument is more accurately viewed as another statement of his contention that Congress did not intend that doctors registered under 21 U.S.C. §§ 821–29 should be punished under section 841. We reject that contention.

Our examination of the legislative history convinces us that Congress intended section 841(a)(1) to apply to registered doctors. Congress was concerned with the diversion of drugs out of legitimate channels of distribution. The registration system, which requires written records to be maintained of drug transfers from manufacturer to doctor to user was intended to serve as a means of monitoring the flow of drugs in an effort to stop diversion to illegal uses. See H.R.Rep.No.91–1444, 1970 U.S.Code, Cong. & Admin.News 4566, 4571–72, 4590 [hereinafter House Report]. This legislative intent is manifested in those penalty provisions of the Act that are applicable only to registrants. Those provisions are focused on proper record keeping. See, e. g., 21 U.S.C. §§ 842(a)(1) (use of prescriptions required), 843(a)(1) (use of order forms required).

There is no suggestion in the legislative history that the registration provisions were intended to be a substitute for the Act's general criminal penalties. The legislative history expressly states that the Act "provides severe criminal penalties for persons engaged in illicit . . . sale of controlled drugs primarily for the profits to be derived therefrom." Since this is what Dr. Rosenberg did, the severe criminal penalties contained in section 841 were appropriately applied to him. This conclusion is buttressed by the facts that physicians were subject to the prior federal drug laws, see, e. g., Jin Fuey Moy v. United States, 254 U.S. 189, 41 S.Ct. 98, 65 L.Ed. 214 (1920), and that one of the three purposes of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (of

which the Controlled Substances Act is title II) was stated in the preamble to be "to strengthen *existing* law enforcement authority in the field of drug abuse." (emphasis added).

One of the findings of the Congress in enacting the Controlled Substances Act was that "(6) *Federal control* of the intrastate incidents of the traffic in controlled substances *is essential to the effective control* of the interstate incidents of such traffic." 21 U.S.C. § 801(6) (emphasis added). If doctors were not subject to section 841(a)(1) the ability of the federal government to counter drug abuse would be greatly reduced. Congress recognized that "the widespread diversion of [controlled substances] out of legitimate channels in to the illegal market" was a serious problem. House Report at 4572. To stop such abuse, Congress determined that "illegal traffic in drugs should be attacked with the full power of the Federal Government." House Report at 4575. Yet, as the dissent recognizes, any doctor can be registered under the Act as a matter of right if he is allowed to dispense controlled substances under state law. House Report at 4590, 21 U.S.C. § 823(f). Revocation of registration is virtually impossi-

ble. See 21 U.S.C. § 824(a). Even conviction of the "technical violations"[5] of section 842 and 843 is foreclosed as long as a doctor complies with the easily fulfilled requirements of prescription writing, etc., contained in the registration sections. See 21 U.S.C. §§ 842, 843, 825, 827–29. Under the reasoning of the dissent a doctor would not even have to pretend to act as a doctor. He could stand on a street corner and sell prescriptions to passersby and yet he would be immune from federal prosecution.[6] To leave the federal government powerless to act against such persons would be to "override common sense" and reject the "evident statutory purpose" of Congress.[7]

Moreover, we note that the dissent's interpretation of the Act would make superfluous one of its main reform provisions. Title I of the Act deals with rehabilitation of addicts. Section 4 of that title provides that the Secretary of Health, Education, and Welfare, in consultation with the Attorney General, "shall determine the appropriate method of professional practice in the medical treatment of narcotic addiction." This section was adopted in light of Congress' awareness that there had been "criminal

---

5. The House Report refers to the violations in section 842(a)(1)–(3) as "technical violations." House Report at 4516. The only other provision expressly applied to registrants is section 843(a)(1) which deals with failures to use the prescribed order forms, another violation properly viewed as technical.

6. We do not understand the dissent's suggestion that veterinarians would somehow be restricted by the Act. They are practitioners, 21 U.S.C. § 802(20), who can register under the Act. Once registered, there is nothing in 21 U.S.C. §§ 842(a)(1), (2), (b), 843(a)(1), which would prevent them from hawking pills to humans. The only limitation imposed by the Act with regard to registration is that the drugs prescribed must be covered by the registration. 21 U.S.C. § 842(a)(2). Under the Act no limitation exists as to whom a registrant can prescribe drugs. Since the veterinarian's prescription would enable a human to buy drugs, the human could use the drugs.

7. The Supreme Court has written that

[t]he canon in favor of strict construction [of criminal statutes] is not an inexorable com-

mand to override common sense and evident statutory purpose. . . . [n]or does it demand that a statute be given the "narrowest meaning"; it is satisfied if the words are given their fair meaning in accord with the manifest intent of the lawmakers.

United States v. Brown, 333 U.S. 18, 25–26, 68 S.Ct. 376, 380, 92 L.Ed. 442 (1948).

In this regard it is interesting to note that the Senate report on the Narcotic Addict Treatment Act of 1974, Pub.L.No.93–281, 88 Stat. 124, discussed Dr. Moore's conviction with approval. (Dr. Moore was the doctor involved in United States v. Moore, 505 F.2d 426 (1974) where the D. C. Circuit held that section 841 cannot be applied to registered doctors). There was *no* indication that the conviction was a violation of Congress' scheme of drug abuse control. If Congress had not intended doctors to be subject to section 841, one would have expected that to have been pointed out by some member of the Senate Judiciary Committee, especially since all but two of its members in 1974 had been on the committee in 1970.

prosecution of physicians whose methods of prescribing narcotic drugs have not conformed to the opinions of Federal prosecutors." House Report at 4581. The committee evidenced no intention to restrict such prosecutions. Indeed they seemed to think that they would continue, but that some standards of professional practice should be established so that "[t]hose physicians who comply with the recommendations made by the Secretary will no longer jeopardize their professional careers by accepting narcotic addicts as patients." House Report at 4581. If a registered doctor was not subject to the penalties of section 841, section 4 of title I would be superfluous because no federal action could be taken against such a doctor in any event.

■ The above considerations, taken altogether with the fact that there is no statement in the legislative history that indicates that doctors are not to be subject to section 841, lead us to conclude that section 841 was appropriately applied in this case.

In dissent Judge Ely relies principally on a decision by the District of Columbia Circuit, United States v. Moore, 505 F.2d 426 (1974), cert. granted, 420 U.S. 923, 95 S.Ct. 1116, 43 L.Ed.2d 392 (1975), which held that doctors registered under the Act, see 21 U.S.C. §§ 821–29, are exempt from the penalty provisions of 21 U.S.C. § 841(a)(1). The court in *Moore* gave essentially three reasons for its decision.

First, it noted that section 822(b) provides that "[p]ersons registered by the Attorney General under this subchapter to manufacture, distribute or dispense controlled substances are authorized to . . . distribute or dispense such substances . . . to the extent authorized by their registrations and in con-

formity with the other provisions of this subchapter." It concluded that this passage was a blanket authorization to dispense drugs that exempted registered doctors from section 841. However, according to the legislative history that section was added merely to "make it clear that persons registered under this title are authorized to deal in or handle controlled substances." House Report at 4606. This section was not part of the original bill, so it can scarcely be called an essential part of the registration scheme. Indeed, it only says that registrants are authorized to do what the Act permits them to do. Thus, in the absence of any explicit direction from Congress, we think it inappropriate to interpret that section to work a major change in the prior enforcement pattern of drug laws which heretofore have not exempted doctors who acted outside the scope of their professional practice from the penal provisions that apply generally to all persons.

The second factor stressed by the *Moore* majority is that while certain of the penalty provisions found in sections 842 and 843 specifically refer to "registrants," that word does not appear in section 841. 505 F.2d at 430. From this the *Moore* court seemed to conclude that registered doctors are subject only to those penalty provisions which specifically refer to registrants. This is clearly a misreading of the statutory scheme. Sections 841, 842, and 843 each apply to all persons.[8] Whenever Congress wanted to limit the scope of a provision's coverage it specifically so indicated. See, e. g., 21 U.S.C. §§ 842(a)(1)–(3), (b), 843(a)(1). In doing so Congress evidenced complete awareness of the distinction between registrants and persons. However, it still chose to apply all of the remaining penalty provisions of the Act

---

8. Section 841 applies to any person unless he is "otherwise authorized" to distribute drugs. We have already indicated that such authorization is contained in section 829, which permits practitioners to write prescriptions. It is suggested by the *Moore* court that this language could also refer to section 822(b). However, since that section only authorizes a regis-

tered doctor to act in conformity with the Act, it is still necessary to refer to section 829. Since a doctor acting outside the course of professional practice is not a practitioner in our view, such a doctor would not be able to avail himself of section 829, and thus would violate section 841 if he made drugs available to other persons by prescription or otherwise.

to any "person." See 21 U.S.C. §§ 841, 842(a)(4)–(8), 843(a)(2)–(5), (b).

We see no reason to construe the statute's clear language in those eleven sections to mean "person other than a registrant." Section 843(a)(3), for example, applies to any person who "acquire[s] or obtain[s] possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge"—a crime obviously committable by any person— registered doctor or otherwise. Yet the reasoning of the D.C. Circuit would seem to compel a holding that registrants were not subject to the provision because the word "registrant" is not included therein. We see no basis for such a result. Congress understood that persons included registrants (see, e. g., 21 U.S.C. § 842(a)(2): "any person—. . . (2) who is a registrant"), and it made 21 U.S.C. § 841(a)(1) apply to "any person."

Finally, the court in *Moore* refused to interpret the 1970 Act in light of the Harrison Act, 505 F.2d at 431–34, because the new act is "fundamentally different." The major difference, however, is only complexity. The Controlled Substances Act was intended to replace the some 50 pieces of legislation dealing with drugs that had been enacted by Congress since 1914. House Report at 4571. In any event, the legislative history of the Act shows that section 841 was meant to apply to drug traffickers. When a doctor acts as Dr. Rosenberg did in this case, he can appropriately be called a trafficker in drugs. While it is difficult to convict a doctor under this standard, a combination of sections 841, 829, 802(20) certainly allows such conviction. Indeed, Congress seemed to recognize that this Act could result in the conviction and punishment of a doctor, just as under the Harrison Act, if the doctor failed to comply with certain standards of professional practice. *See* House Report at 4581.

Thus, we conclude that the Controlled Substances Act, including 21 U.S.C. § 841, on its face, can be applied to registered doctors. The reasons advanced by the dissent and the *Moore* court are at best inconclusive of Congress' intent. Since there are other indications in the Act and in the legislative history that Congress intended section 841 to apply to registered doctors, we hold that the Act does, and was intended by Congress to, apply to the registered doctors acting outside the course of professional practice. For further support of this view, see United States v. Green, 511 F.2d 1062, at 1066–1069 (7th Cir., 1975), United States v. Moore, 505 F.2d at 444–58 (MacKinnon, J., dissenting).

■ We turn now to the arguments raised by Dr. Rosenberg in his various briefs filed in this court.[9] First, he argues that he was convicted of violating a regulation issued by the Attorney General rather than the Act itself. He suggests that this would violate the doctrine of separation of powers because the Department of Justice has no statutory authorization to issue regulations that create new criminal offenses.[10] The indictment against Dr. Rosenberg charged him with distributing pills not "in the usual course of professional practice" and not "for any legitimate medical research purposes." The first quoted phrase is similar to the statutory language, see 21 U.S.C. § 802(20); the second is similar to the language in the regulation, see 21 C.F.R. § 1306.04(a) (1974). The indictment referred only to

---

**9.** Apparently only Dr. Moore has thought that section 841 did not apply to registered doctors. This argument is not among the many arguments made by Dr. Rosenberg, and it does not seem to have been made before any other court, see United States v. Moore, 505 F.2d 426, 434 n. 44 (D.C.Cir. 1974). The fact that virtually everyone has assumed that registered doctors are subject to section 841 is some evidence that Congress intended them to be.

**10.** The Attorney General does have the power to "promulgate and enforce any rules, regulations, and procedures which he may deem necessary and appropriate for the efficient execution of his functions under this subchapter." 21 U.S.C. § 871(b).

21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2(b) (general provision on liability of principals for criminal acts); no mention was made of any regulation. Dr. Rosenberg seems to argue that these two phrases have different meanings and that he was convicted of violating the regulation. We disagree.

The two phrases in the indictment have essentially the same meaning. At no time did Judge Gray instruct the jury (or even suggest to the jury) that there were two separate ways in which the statute could be violated. In his instructions to the jury on what he called the "principal issue" Judge Gray charged that

> (t)he law makes it unlawful for any person to distribute a controlled substances except a practitioner who causes the controlled substance to be *distributed in the course of professional practice.* If this doctor was causing the controlled substance to be prescribed while acting as a doctor *in the course of his professional practice,* then there's no violation. However, if he was not acting in good faith as a doctor, but simply pushing pills, as counsel has said, then he does not come within the exception, and the law is violated.

The trial judge stressed that the jury had to look into Dr. Rosenberg's mind to determine whether he prescribed the pills for what he thought was a medical purpose or whether he was passing out the pills to anyone who asked for them. He in no way indicated that the jury could find Dr. Rosenberg guilty if it found that he either acted not in the course of his professional practice or not for legitimate medical reasons. In fact, as the extract from the judge's charge demonstrates, he laid out the issue as whether the doctor had acted not in the course of professional practice, which is the statutory language. While the trial judge later used the phrase "good faith

for legitimate medical treatment in the usual course of his professional practice," it seems clear that the trial judge was simply elaborating on the statutory language, as he did in other ways on different occasions.[11] We find it difficult to understand how Dr. Rosenberg can argue that he was not acting for legitimate medical reasons yet was acting in the course of his professional practice.

Dr. Rosenberg next argues that the phrase "in the course of professional practice" is so vague that it violates the due process clause of the Fifth Amendment. The Supreme Court has recently held that "(t)o avoid the constitutional vice of vagueness, it is necessary, at a minimum, that a statute give fair notice that certain conduct is proscribed." Rabe v. Washington, 405 U.S. 313, 315, 92 S.Ct. 993, 994, 31 L.Ed.2d 358 (1972) (per curiam). Here we think that the statute does give such fair notice. This language has been in the statute books since 1914 and no one has ever had problems with its interpretation. The language clearly means that a doctor is not exempt from the statute when he takes actions that he does not in good faith believe are for legitimate medical purposes.

The Supreme Court had several occasions to interpret this language when it was used in the Harrison Narcotics Law § 2, 38 Stat. 785. For example, in Jin Fuey Moy v. United States, 254 U.S. 189, 194, 41 S.Ct. 98, 100, 65 L.Ed.2d 214 (1920) (emphasis added), the Court noted that "the phrases 'to a patient' and 'in the course of his professional practice only' are intended to confine the immunity of a registered physician, in dispensing the narcotic drugs mentioned in the act, strictly within *the appropriate bounds of a physician's professional practice,* and not to extend it to include a sale to a dealer or a distribution intended to cater to the appetite or satisfy the craving of one addicted to the use of the

---

11. This interpretation is supported by language in the Supreme Court cases discussed *infra.*

drug." Two years later the Court again explained the meaning of the statute: "[T]he purpose of the exception is to confine the distribution of these drugs to the *regular and lawful course of professional practice.*" United States v. Behrman, 258 U.S. 280, 287, 42 S.Ct. 303, 304, 66 L.Ed. 619 (1922) (emphasis added). In another case the Court said that "[t]he disputed question was whether the defendant issued the prescriptions *in good faith in the course of his professional practice.*" Boyd v. United States, 271 U.S. 104, 105, 46 S.Ct. 442, 90 L.Ed. 857 (1926) (emphasis added).

The ease and consistency with which courts have interpreted this language convinces us that it is not vague. See also United States v. Collier, 478 F.2d 268, 271–72 (5th Cir. 1973); United States v. Larson, 507 F.2d 385 (9th Cir. 1974). Moreover, it is difficult to see how the language can be made more precise and at the same time ban the undesirable conduct on the part of physicians which Congress intended to make illegal and subject to sanctions.

■ Third, Dr. Rosenberg attacks the constitutionality of the federal drug laws. He urges that they violate the Tenth Amendment.[12] Specifically Dr. Rosenberg argues that the determination of whether or not he was acting in the course of his professional practice must be determined by the state of California because "direct control of medical practice in the states is beyond the power of the federal government." Linder v. United States, 268 U.S. 5, 18, 45 S.Ct. 446, 449, 69 L.Ed. 819 (1925). He also argues that the language of the statute makes it clear that Congress intended that the federal government rely on such a state determination. These arguments are singularly unpersuasive.

■ As the doctor admits in his brief, the Tenth Amendment is generally viewed as stating a truism. "From the beginning and for many years the amendment has been construed as not depriving the national government of authority to resort to all means for the exercise of a granted power which are appropriate and plainly adapted to the permitted end." United States v. Darby, 312 U.S. 100, 124, 61 S.Ct. 451, 462, 85 L.Ed. 609 (1941). The authority of Congress to control the dispensation of narcotics or other dangerous drugs under a taxing scheme was expressly upheld in United States v. Doremus, 249 U.S. 86, 39 S.Ct. 214, 63 L.Ed. 493 (1919).[13] While the current drug laws are not part of a revenue-raising scheme, we have no doubt that Congress has the power to regulate drugs under the Interstate Commerce clause of the Constitution. United States v. Collier, 478 F.2d 268, 272–73 (5th Cir. 1973). The statute involved in this case is constitutional.[14]

■ Fourth, Dr. Rosenberg argues that the federal drug control statute violates due process because it establishes a

---

12. The Tenth Amendment states, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

13. *Doremus* was discussed and cited with approval in *Linder,* the case relied upon by defendant. Linder v. United States, supra, 268 U.S. at 19, 45 S.Ct. 446.

14. The doctor argues that the cases upholding the constitutionality of drug laws are distinguishable because the defendants in those cases had prescribed excessive amounts of drugs and were clearly not acting in the course of professional conduct. He claims that since his prescriptions were within the legal quantity limits for such prescriptions and since it

was not clear that he was acting other than in the course of his professional conduct, the Constitution somehow requires that the state of California must first find his acts were unauthorized before federal prosecution is permissible. We do not agree. If the Constitution allows the federal government to regulate the dispensation of drugs, it allows it to do so in every case, and not just where more than a certain quantity of drugs are involved. It would be impractical and unheard of first to determine whether a physician's conduct was or was not sufficiently egregious in order to decide whether federal or state-federal prosecution was appropriate. The question of whether federal criminal laws have been violated is a federal issue to be determined in federal courts.

presumption of guilt. The doctor focuses on 21 U.S.C. § 885(a)(1) which provides that

> [i]t shall not be necessary for the United States to negative any exemption or exception set forth in this subchapter . . . in any trial, hearing, or other proceeding under this subchapter, and the burden of going forward with the evidence with respect to any such exemption or exception shall be on the person claiming its benefit.

We find nothing wrong with this provision. It is a common provision in criminal statutes that contain many exemptions or exceptions. Without such a provision the government would be required to waste valuable court time disproving arguments that a defendant did not and could not conceivably make.

The important fact is that the quoted provision does not shift the burden of proof. Once a defendant presents a claim that he falls within the exemption, the government must prove beyond a reasonable doubt that the accused does not fall within it. In this case a reading of the trial judge's instructions to the jury leaves no doubt that the government was required to prove beyond a reasonable doubt that Dr. Rosenberg was not a physician acting in the course of his professional conduct. 21 U.S.C. § 885(a)(1) is clearly constitutional. United States v. Collier, *supra,* at 273.

Fifth, the doctor argues that there was insufficient evidence to sustain a guilty verdict. In addition to the testimony outlined above, there was additional evidence to support the conviction of the defendant. For example, the agents testified, among other things, that when they paid their money, but did not receive prescriptions, the money was refunded; that they indicated to the doctor that they were giving some of the prescribed pills to other people, and that they were also obtaining pills from other doctors. In addition, the government offered the testimony of a medical expert, who stated that proper professional practice required that a doctor give a physical examination before prescribing the drugs involved here for a patient he had never seen before. The expert also indicated that dexedrine has only limited uses and in the area of weight control is primarily used to help grossly obese people lose weight. In rebuttal, Dr. Rosenberg offered only his own testimony.

We think that the testimony of the expert and the facts outlined by the agents are sufficient to sustain the defendant's conviction. Indeed, the jury could decide for itself, on the basis of the facts shown and without any expert testimony, that Dr. Rosenberg was not acting in the course of his professional practice. United States v. Larson, 507 F.2d 385 (9th Cir. 1974); United States v. Badia, 490 F.2d 296 (1st Cir. 1973); United States v. Bartee, 479 F.2d 484 (10th Cir. 1973). There was ample evidence to support the verdict of the jury.

Sixth, Dr. Rosenberg argues that his conviction should be overturned because his medical files were used against him in violation of his Fifth Amendment right against self incrimination.[15] The validity of the doctor's arguments turns in the first instance on whether or not he had a protected interest in his prescription records. The general rule is that if records are required to be maintained by law then a defendant cannot assert a privilege against self incrimination with respect to those records. Shapiro v. United States, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948).

A California statute requires that records of prescriptions for the drugs involved in this case be kept for two years. Cal.Health & Safety Code § 11191. While the statute does not expressly pro-

---

**15.** On September 24, 1973, Dr. Rosenberg was served with a grand jury subpoena for his patient records as they related to the dispensation of narcotic substances to several named persons. He supplied the records for all but one of the patients covered by the subpoena. On a motion to suppress the records as evidence Dr. Rosenberg claimed that he was tricked into surrendering them. The district court, however, found that he was not tricked.

vide that records shall be open to inspection by state officials,[16] we think that the only purpose for the record-keeping requirement is to aid in the enforcement of the drug control statutes.

In Grosso v. United States, 390 U.S. 62, 68, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968), the Supreme Court laid down three criteria to be used in determining the applicability of the official-records exception to the Fifth Amendment. The first is that the purpose of the record-keeping requirement is essentially regulatory. Second, that the records are customarily kept, and third, that the records have public aspects. These criteria are clearly met in this case. Cf. United States v. Resnick, 488 F.2d 1165 (5th Cir. 1974). Dr. Rosenberg's Fifth Amendment rights were not violated.

 Finally, Dr. Rosenberg argues that he was improperly indicted for unlawfully "distributing" a controlled substance. He contends that he should have been charged with unlawfully "dispensing" a controlled substance. We find no merit in this argument. United States v. Black, 512 F.2d 864 (9th Cir. 1975); United States v. Badia, 490 F.2d 296 (1st Cir. 1973); but see United States v. Leigh, 487 F.2d 206 (5th Cir. 1973). We have previously upheld convictions for distribution in similar circumstances. United States v. Cosby, 500 F.2d 405 (9th Cir. 1974); United States v. Larson, supra.[17]

We have considered the other arguments made by Dr. Rosenberg and find them to be without merit.

Affirmed.

ELY, Circuit Judge (dissenting):

I respectfully dissent.

In my view, the clear holding of United States v. Moore, 505 F.2d 426 (D.C. Cir.1974), cert. granted, —— U.S. ——, 95 S.Ct. 1166, 43 L.Ed.2d 392 (1975), completely destroys any statutory basis for Dr. Rosenberg's convictions. Moore holds, with one judge dissenting, that Congress did not intend to subject licensed, registered physicians to the harsh, generally-applicable penal sanctions of 21 U.S.C. § 841 for alleged offenses arising from their prescribing controlled substances that have accepted uses in medical treatment. My intensive review of the complete structure of Title II of the Drug Abuse Prevention and Control Act of 1970 (hereinafter "the Act" or "the 1970 Act"), 21 U.S.C. § 801 et seq., in which section 841[1] appears, convinces me, beyond question, that the conclusion reached by the majority in Moore is correct and that, hence, the majority's disposition of the present appeal cannot be logically sustained.

### I. Statutory Analysis

In the 1970 Act, Congress undoubtedly intended to strike a hard blow at drug traffickers. Nevertheless, Congress had before it a competing consideration, which is listed first among its findings and declarations:

Many of the drugs included within this [Act] have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare of the American people.

21 U.S.C. § 801(1). To assure the availability of such drugs for the nation's medical needs and yet to prevent, insofar as possible, the diversion of such drugs into illegitimate channels, Congress created, in Part C of the Act, 21 U.S.C. §§ 821–829, that which Congress termed ". . . a 'closed' system of drug distribution for legitimate handlers." H.R. Rep.No.1444, 91st Cong., 2d Sess. 6 (1970) (1970 U.S.Code Cong. & Admin. News 4571–72). Part C establishes a

---

16. The statute at one time expressly provided that the records were to be open to such inspection.

17. Since the defendant raised this argument only as an afterthought in a brief filed after the argument, he can scarcely claim that he was not fully apprised of the charges against him. See The Schooner Hoppet v. United States, 7 Cranch 389, 11 U.S. 389, 394, 3 L.Ed. 380 (1813).

1. All sections of the Act are numbered as they appear in Title 21, United States Code.

comprehensive scheme for registering and controlling the physicians, pharmacists, pharmaceutical manufacturers, research scientists, and others whose professional duties require that they be licensed or otherwise legally authorized to manufacture or dispense controlled substances.

Within Part C, section 822(a) requires that physicians and the other professionals within the scope of the "closed system" register annually with the Attorney General. As to physicians, the Attorney General must grant such registration *pro forma*. He has absolutely no discretion to refuse to register a physician who is already licensed to dispense controlled substances by the state in which the physician practices.[2] 21 U.S.C. § 823(f). Once a physician is registered, the Act makes clear that he is fully authorized to administer or dispense controlled substances to the extent permitted by his registration, 21 U.S.C. § 822(b),[3] and the only restriction the Act applies to the registrations of physicians is that such registrations confer no authority whatsoever to deal in those controlled substances that have no accepted values in medical treatment. Medically worthless drugs, such as heroin, most of the other opiates, and LSD, are listed in the Act's Schedule I, 21 U.S.C. § 812(b)(1); and section 823(f) expressly limits the registrations authorized for physicians to the controlled substances listed in Schedules II, III, IV, and V, all of which have accepted medical uses.[4] *See* 21 U.S.C. §§ 812(b)(2)–812(b)(5).

Congress included within Part C a system of administrative controls over physicians and the other members of the "closed system." There are, for example, extensive record-keeping requirements, and section 829 sets forth the detailed requirements pertaining to doctors' "prescriptions" for the controlled substances in Schedules II, III, IV, and V. Physicians who abuse their authority to dispense controlled substances are subject to a range of specialized sanctions. Of course, the ultimate and undoubtedly most effective sanction against a physician who uses his professional status merely to traffic in drugs is that his state's licensing authority may revoke his medical license. Upon such revocation, the physician's registration under Part C is also revoked; but there are also other reasons for which the Attorney General may suspend or revoke a Part C registration. 21 U.S.C. § 824. In addition, two later sections of the Act, 21 U.S.C. §§ 842 and 843, identify a number of "unlawful acts" and prescribe penalties, both civil and criminal, that apply specifically to "registrants" or "persons who are subject to the registration requirements of Part C."[5]

In contrast, section 841, the statute under which Dr. Rosenberg stands con-

---

2. Dr. Rosenberg was licensed as a physician by the State of California. The statute defining the scope of a licensed physician's practice in California, Cal.Bus. & Prof.Code § 2137 (West 1974), reads as follows:

 The physician's and surgeon's certificate authorizes the holder to use drugs or what are known as medical preparations in or upon human beings and to sever or penetrate the tissues of human beings and to use any and all other methods in the treatment of diseases, injuries, deformities, or other physical or mental conditions.

3. The 1970 Act was derived principally from the House bill. As to section 822(b), the House committee report states: "The committee inserted this subsection to make it clear that persons registered under this title are authorized to deal in or handle controlled sub-

stances." H.R.Rep.No.1444, 91st Cong., 2d Sess. 38 (1970) (1970 U.S.Code Cong. & Admin.News 4606).

4. The charges against Dr. Rosenberg were based on prescriptions he had written for controlled substances listed in Schedules II, III, and IV.

5. The criminal penalties provided for registrants in sections 842 and 843 are not as great as those provided in section 841, the statute generally applicable to narcotics traffickers; nevertheless, the sections 842 and 843 sanctions are substantial. Section 842 authorizes a maximum punishment of one year's imprisonment and a $25,000 fine. Section 843 provides for imprisonment for a period as long as four years, plus a maximum fine of $30,000.

victed, contains neither the word "registrant" nor the phrase "persons subject to the requirements of Part C." Rather, its application is limited by the introductory phrase, "[e]xcept as authorized by this subchapter," and the only "exception" to which this phrase logically can apply is that created for the "closed system" by the registration scheme of Part C. The phrase "as authorized by this subchapter" in section 841 specifically reflects the "[p]ersons registered . . . are authorized . . . " language of section 822(b) in Part C.

There is no language whatsoever in either section 841 or in Part C that supports the view that a physician loses the exception granted by his registration under Part C and thereby becomes subject to the penal sanctions of section 841 by prescribing medically-accepted drugs for what a jury might thereafter determine to be an improper purpose.[6] Dissenting in *Moore,* Judge MacKinnon writes that Congress's use in section 841 of the verb "dispenses," along with the other verbs "manufactures," "distributes," and "possesses," indicates that Congress intended to subject physicians to 841 liability, since Part C professionals are the only one who may "dispense," as that term is defined in section 802(10). Judge MacKinnon further suggests that since Congress provided in section 824(a) that the Attorney General may revoke a practitioner's Part C registration if the practitioner is convicted under the Act for a felonious offense, Congress must have intended that section 841, the Act's only felony provision, should apply. United States v. Moore, *supra* 505 F.2d at 451, 454 (MacKinnon, J., dissenting).

As to both provisions, Judge MacKinnon overlooks the explanation that registered physicians have no authority to deal in Schedule I controlled substances. Consequently, a physician may illegally "dispense" Schedule I controlled substances and may be prosecuted under the felony provisions of section 841 for doing so. Furthermore, the provisions cited by Judge MacKinnon apply not only to physicians, but also to such other professionals as pharmacists and veterinarians whose state licenses and Part C registrations "authorize" a narrower scope of activities than that authorized for licensed physicians. Since the Attorney General issues a Part C registration to a practitioner solely on the basis of the practitioner's state professional license, 21 U.S.C. §§ 802(20), 823(f), the registration could authorize the practitioner to deal in controlled substances only to the extent permitted by the state license. For example, Part C would provide no immunity from section 841 for a veterinarian who "dispenses" Schedule II controlled substances to human patients, since the veterinarian's state license would not authorize him to undertake such treatments. If this does not clarify the misunderstanding expressed in one of the majority's footnotes in respect to the point here discussed, then I am unable to eliminate that misunderstanding.

After studying the Act in its entirety, I am impelled to the conclusion that

---

6. The majority's argument that Title I, section 4 of the Act, 42 U.S.C. § 257a, which focuses on the development of standards for medical treatment of narcotics addicts, stands as evidence that Congress intended that the general criminal penalties of section 841 should apply to registered physicians has already been rebutted in United States v. Moore, 505 F.2d at 433–34. I note in addition, however, that on its face, 42 U.S.C. § 257a says nothing whatsoever about any criminal sanctions applicable to physicians who fail to follow the standards promulgated by the Secretary of Health, Education and Welfare. Rather, the Secretary's role under the statute appears primarily to relate to research and the advancement of generally-available scientific knowledge concerning the treatment of narcotics addiction. Furthermore, the majority is incorrect in asserting that under my reading of the Act, any special provision concerning the treatment of addicts would be superfluous since a physician could never be prosecuted for providing drugs simply to maintain an addiction. The majority overlooks, or chooses to disregard, the significant point, made earlier, that Part C confers absolutely no authority on registered physicians to deal in Schedule I controlled substances. Consequently, Part C would provide no protection to a doctor who "dispenses" heroin to a heroin addict.

Congress chose not to place a physician in jeopardy of the severe criminal sanctions of section 841 on such a slender thread as a jury's later conclusion that the physician has prescribed a drug with accepted medical values for an improper purpose. Congress obviously intended for any such abuses to be halted through professional or administrative action and through imposition of the less-severe criminal and civil sanctions provided in sections 842 and 843. *Accord,* United States v. Moore, *supra.*

## II. Vagueness

Rejecting the careful statutory analysis of *Moore,* my Brothers choose instead to take our Court further down the tortured and mistaken path first chosen by the Fifth Circuit in United States v. Collier, 478 F.2d 268 (5th Cir. 1973). In doing so, the majority violates one of the cardinal principles of statutory construction—that courts must ascertain the meaning of a doubtful statute by looking to the statutory enactment as a whole, not merely to isolated words and phrases. *See, e. g.,* Richards v. United States, 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). That my Brothers may travel in excellent company, *see* United States v. Bartee, 479 F.2d 484 (10th Cir. 1973); *cf.* United States v. Larson, 507 F.2d 385 (9th Cir. 1974);[7] United States v. Badia, 490 F.2d 296 (1st Cir. 1973), does not, despite their protests to the contrary, save them from their wrongful detour.

In a nutshell, the majority's reasoning is as follows: The "[e]xcept as authorized by this subchapter" proviso in section 841 refers to section 829, in Part C of the Act, which provides for the dispensing of controlled drugs on the basis of a prescription written by a "practitioner." And, a physician is a "practitioner," as

that term is used in section 829 and defined in section 802(20), only when the prescriptions he writes are ". . . in the course of professional practice," 21 U.S.C. § 802(20), a phrase that the majority reads to mean "in the course of a *proper, usual,* or *legitimate* professional practice."

As the majority plainly recognizes, the validity of their view concerning the applicability of section 841 to registered physicians depends entirely on the correct reading of the phrase, ". . . in the course of professional practice . . .," which appears not in the penal statute itself, but in the Act's general definition of the term "practitioner." In pertinent part, that definition reads:

> The term "practitioner" means a physician . . . licensed by . . . the jurisdiction in which he practices . . . to . . . dispense a controlled substance in the course of professional practice . . ."

21 U.S.C. § 802(20).

One's first logical reaction after reading the phrase ". . . in the course of professional practice . . .," in the context in which it is used, must be that Congress included it within the definition in order to specify the type of license that qualifies a physician for the "practitioner" designation. Once a physician has received such a license from his state, it seems obvious, under the definition, that he is, and remains so long as he retains his license, a "practitioner." At the time of Dr. Rosenberg's alleged offenses, he was duly and regularly licensed by the State of California ". . . to . . . dispense a controlled substance in the course of professional practice . . .;" therefore, Dr. Rosenberg was a "practitioner."[8] The majority's different construction of the phrase, which is that the phrase has a

---

**7.** I was a member of the panel of this court that decided *Larson,* wherein we unanimously affirmed the section 841 conviction of a licensed physician on facts similar to those presented here. Because of the more searching inquiry prompted by the briefs and arguments in this case and by the decision in

*Moore,* I am now convinced that our decision in *Larson* was wrong. I regret, of course, that I cannot now undo my judicial mistake in respect to *Larson.*

**8.** *See* the relevant California statute, quoted *supra* n. 2.

chameleon-like effect that operates to deprive a physician of the status of "practitioner" whenever the physician acts outside the scope of what a jury of laypersons believes to be a proper, usual, or legitimate professional practice, seems, with all due respect, quite strained. The majority adopts its interpretation despite the well-established rule that penal statutes must be construed strictly in favor of the accused. *See e. g.,* Bell v. United States, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955).

Assuming, *arguendo,* however, that Congress did intend to give the phrase the meaning the majority attributes to it, Congress has, without doubt, used language that is " . . . so vague that men of common intelligence must necessarily guess as to its meaning and differ as to its application." Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). The Constitution plainly condemns such vagueness, especially in criminal statutes. *See, e. g.,* Smith v. Goguen, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974). One of the principal vices of vagueness in penal statutes is, as here, " . . . the treachery they conceal . . . in determining what persons are included . . .." United States v. Cardiff, 344 U.S. 174, 176, 73 S.Ct. 189, 190, 97 L.Ed. 200 (1952).

The majority apparently concedes that the phrase, " . . . in the course of professional practice . . .," is, on its face, too imprecise to support a criminal conviction. But the majority concludes that the phrase's meaning has been clarified by several old decisions of the Supreme Court that construe what the majority asserts to be similar language in the now-repealed Harrison Anti-Narcotic Act, ch. 1, 38 Stat. 785, enacted in 1914. I submit that the majority's reliance on the Harrison Act cases is obviously misplaced.

The legislative history of the 1970 Act reveals that Congress intended the new Act to be a complete revision of the criminal provisions of the federal narcotics laws. *See* United States v. Moore, *supra* 505 F.2d at 431–34. Without question, Congress sought completely to abrogate the criminal provisions of the old Harrison Act. This fact alone should stand as a clear warning against any blind reliance on the Harrison Act precedents in interpreting the new Act's provisions.

But there is an additional reason for not doing what the majority has done with the Harrison Act decisions. In those cases the Supreme Court construed a proviso that appeared directly in the penal section of the Harrison Act and which read:

> Nothing contained in this section shall apply—
>
> (a) To the *dispensing* of any of the aforesaid drugs *to a patient* by a physician . . . registered under this Act in the course of his professional practice *only.*

Ch. 1, § 2, 38 Stat. 786. (Emphasis added.) Yet the majority seeks to employ the Supreme Court's opinions to clarify the following phrase from the 1970 Act: " . . . licensed . . . to dispense . . . a controlled substance in the course of professional practice . . .." 21 U.S.C. § 802(20). The differences between the two statutes hardly require elaboration. The new Act does not contain the very elements that give the Harrison Act proviso its clear meaning—the phrase "to a patient" and the small but powerful word "only." *These are the precise portions of the Harrison Act proviso upon which the Supreme Court decisions cited by the majority rely.* United States v. Behrman, 258 U.S. 280, 288, 42 S.Ct. 303, 66 L.Ed. 319 (1922); [9] Jin Fuey Moy v. United States,

---

**9.** In *Behrman,* the Supreme Court reversed a District Court's dismissal of an indictment that charged a physician with prescribing large quantities of heroin and morphine to a person known by the physician to be an addict for the

allegedly illegal purpose of maintaining the addict's habit. The Supreme Court held that the indictment stated an offense against the physician under the Harrison Act. Despite the language of the Harrison Act proviso pertaining

254 U.S. 189, 194, 41 S.Ct. 98, 65 L.Ed.2d 214 (1920). Furthermore, the Harrison Act proviso spoke in terms of "dispensing," which is the way that the majority, in effect, rewrites the new Act, even though, as I have hitherto thoroughly demonstrated, the operative verb in the new Act is "licensed."

Actually, the Harrison Act cases support my interpretation of the 1970 Act, rather than the wholly unwarranted interpretation of the majority. My Brothers assert that Congress intended in the 1970 Act to continue the same criminal liability for registered physicians that so clearly existed under the Harrison Act. If this is true, the majority might have undertaken an explanation of why Congress chose in the new Act, in the face of consistently favorable Supreme Court interpretations of the Harrison Act proviso, to alter drastically the language of the proviso by deleting "to a patient" and "only," to cast the proviso in terms of "licensing" instead of "dispensing," and to move the proviso from the penal provision to the general definitions section of the Act.

Finally, in further support of its interpretation of the phrase, " . . . in the course of professional practice . . .," the majority relies on an administrative regulation, 21 C.F.R. § 1306.04(a), which was issued by the Attorney General. The majority's reliance again is misplaced. To me, it is inconceivable that an unconstitutionally vague and ambiguous penal statute can

be cured by a regulation issued by the prosecuting agency. Furthermore, the cited regulation has no relationship whatsoever to the definition of "practitioner" in section 802(20), in which the critical statutory phrase appears. Rather the Attorney General promulgated the regulation pursuant to his general statutory authority under section 821 to make rules for the "closed system" established in Part C. Specifically, the regulation applies to section 829, the portion of Part C that establishes the administrative requirements pertaining to doctors' prescriptions. A physician who violates one of the regulations pertaining to Part C possibly subjects himself to the administrative and professional sanctions contemplated in Part C and to the specialized provisions for Part C registrants in sections 842 and 843.

The majority, however, and correctly in my view, does not contend that violation of such a regulation, alone, could subject a physician to prosecution under the general penal provisions of section 841.[10] Rather, the majority relies on the Attorney General's regulation, along with the Supreme Court's Harrison Act precedents, to eliminate the ambiguity encountered in the section 802(20) phrase, ". . . in the course of professional practice . . .." I think that, at most, the majority should consider the regulation as an admission by the executive officer responsible for administering the Act that the crucial phrase, as it appears in the statute, is too vague to support the criminal liability that the Government asserts.

to physicians, which would establish Dr. Behrman's criminal liability far more clearly than could the critical language in the 1970 Act, Justices Holmes, Brandeis, and McReynolds dissented. The dissenters' comments, written by Mr. Justice Holmes, are fully applicable to the result the majority reaches in the instant case.

It seems to me impossible to construe the statute as tacitly making such acts, however foolish, crimes, by saying that what is in form a prescription and is given honestly in the course of a doctor's practice, and therefore, so far as the words of the statute go, is allowed in terms, is not within the words, is not a prescription and is not given in the

course of practice, if the Court deems the doctor's faith in his patient manifestly unwarranted. It seems to me wrong to construe the statute as creating a crime in this way without a word of warning.
258 U.S. at 290, 42 S.Ct. at 305 (Holmes, J., dissenting).

**10.** The majority does note that section 871(b) grants the Attorney General authority to promulgate rules and regulations for the effective administration of the Act. With this I do not quarrel. It is clear, however, that section 841, under which Dr. Rosenberg was convicted, contains no provision to the effect that a violation of the Attorney General's regulations constitutes a criminal act.

The question posed by the ambiguity in the section 802(20) phrase is whether Congress intended to subject licensed physicians to criminal prosecution under section 841 for dispensing medically-approved controlled substances in an allegedly unprofessional manner. To permit the Attorney General to answer that question, in the guise of issuing an "interpretive" regulation, would be, in my view, to countenance an intolerable violation of the doctrine of separation of powers. By such a regulation, the Attorney General could subject a class of persons to criminal liability under a Congressional act wherein, at best, it is unclear whether Congress intended that such liability should attach. *See* Viereck v. United States, 318 U.S. 236, 63 S.Ct. 561, 87 L.Ed. 734 (1943); *cf.* Reid v. Covert, 354 U.S. 1, 38–39, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (Opinion of Black, J.).

In conclusion, I firmly hold that Dr. Rosenberg's convictions simply cannot be sustained on the basis of the majority's reasoning. My Brothers, I think, have subconsciously responded to a realistic concern that the severe sanctions of section 841 are necessary to prevent some licensed physicians from degrading themselves and damaging society by falling into the category of common drug pushers. I can agree that such a possibility exists and, indeed, even that the majority's legitimate concern may be illustrated by Dr. Rosenberg's activities. But we are sworn to uphold the law, and

men are not subjected to criminal punishment because their conduct offends our . . . emotions or thwarts a general purpose sought to be effected by specific commands which they have not disobeyed. Nor are they to be held guilty of offenses which the statutes have omitted . . . to define and condemn. For the courts are without authority to repress evil save as the law has proscribed it and then only according to law.

Viereck v. United States, *supra,* 318 U.S. at 245, 63 S.Ct. at 565.

I would reverse.