## COMMONWEALTH *VS.* KENNARD C. KOBRIN.

No. 04-P-1678.

Bristol. September 14, 2007. - September 12, 2008.

Present: LENK, GELINAS, & GRAINGER, JJ.

*Doctor,* Controlled substances. *Controlled Substances. Medicaid. Fraud. Practice, Criminal,* New trial.

Discussion of the Massachusetts Controlled Substances Act, G. L. c. 94C, and the proof needed to establish a physician's criminal liability thereunder. [595-598].

At the trial of an indictment charging the defendant psychiatrist with illegally prescribing a Class C substance to a patient, the evidence, even when taken in the light most favorable to the Commonwealth, failed to establish beyond a reasonable doubt that the defendant wrote the relevant prescription in bad faith or absent a legitimate medical purpose to treat the patient's condition. [598-608]

At the trial of indictments charging the defendant psychiatrist with, inter alia, Medicaid fraud under G. L. c. 118E, §§ 40 and 41, the judge properly denied the defendant's motion for required findings of not guilty, where the jury could reasonably have inferred that the defendant referred patients to a psychologist who was a tenant in the defendant's building, for psychological tests that the defendant knew were not medically necessary, in exchange for an excessive amount of rent from the tenant psychologist [608-609], and that the tenant psychologist actually submitted reimbursement claims to Medicaid for the tests [609-611].

A Superior Court judge neither erred nor abused his discretion in ordering a new trial of indictments charging the defendant psychiatrist with Medicaid fraud, where the judge properly took into account newly discovered information, developed during posttrial discovery (and which the defendant's trial counsel would not have uncovered before trial using reasonable diligence), that made plain that no reimbursement claims for the subject psychological tests — which the defendant had ordered for patients for whom such tests were not medically necessary — had ever been submitted to Medicaid [611-613], and where it was readily apparent that this evidence would probably have been a real factor in the jury's deliberation [613-614]; moreover, there was no validity to the Commonwealth's contention that it was not required to prove that claims had actually been submitted to Medicaid for the tests ordered in order to prove a false statement or representation of a material fact on the part of the defendant in violation of the second clause of G. L. c. 118E, § 40 [614-617].

INDICTMENTS found and returned in the Superior Court Department on December 17, 1998.

The cases were tried before *Robert J. Kane*, J., and posttrial motions were heard by him.

*George C. Deptula* for the defendant.

*Peter Clark*, Assistant Attorney General, for the Commonwealth.

LENK, J. The defendant, Kennard C. Kobrin, is a board certified psychiatrist who for many years maintained a busy private practice in Fall River. Many of his patients had dual diagnoses of mental illness and substance abuse; a significant subset was eligible for benefits under either the Medicare or Medicaid program, or both. In 1998, a grand jury returned sixteen indictments against Kobrin in eighty-two counts on charges stemming from practices in his Fall River office; the charges were in the nature of Medicaid fraud under G. L. c. 118E, §§ 40 and 41, and the illegal prescribing of controlled substances under G. L. c. 94C, § 32B(*a*). Four years later and after a month-long trial by jury, the defendant was acquitted of all but three counts: one count of illegally prescribing a Class C controlled substance (the benzodiazepine known as Klonopin) to a patient of long standing (Patient D), and two counts of Medicaid fraud for ordering unnecessary psychological testing of two patients (Patients D and G).

The trial judge denied Kobrin's posttrial motions for required findings of not guilty pursuant to Mass.R.Crim.P. 25(b)(2), 378 Mass. 896 (1979), as to all three convictions but allowed his later motion for new trial pursuant to Mass.R.Crim.P. 30(b), as appearing in 435 Mass. 1501 (2001), on the two Medicaid convictions. The judge declined to order a new trial as to the illegal prescribing conviction. The matter is now before us on cross appeals: Kobrin appeals the denial of his motions for required findings of not guilty on all three convictions as well as the denial of his motion for new trial on the illegal prescribing conviction; the Commonwealth appeals the order allowing the motion for new trial on the two Medicaid fraud convictions. We affirm in part and reverse in part, concluding that a new trial was properly ordered on the Medicaid fraud convictions and that the evidence was insufficient to sustain a conviction on the illegal prescribing conviction.

*Background.*[1] Between 1982 and 1999, Kobrin maintained a private practice in psychiatry in leased professional office space located at 210 Rock Street in Fall River. As mentioned, many of his patients presented with psychiatric illnesses as well as substance abuse issues and qualified for benefits under the Medicare and Medicaid programs. Kobrin shared his office suite with other mental health practitioners, including psychologists who subleased space one or more days per week, paying handsomely for doing so. Kobrin referred patients to these psychologists (the "tenant psychologists") for testing and therapeutic services; the majority of the services performed was reimbursed by insurance including Medicare and/or Medicaid.

In December, 1998, the grand jury returned sixteen indictments against Kobrin in eighty-two counts, charging him with illegally prescribing controlled substances; Medicaid fraud based on the aforesaid prescriptions; Medicaid fraud based on his soliciting and accepting kickbacks from the tenant psychologists after referring patients to them for medically unnecessary psychological testing[2]; and Medicaid fraud based upon his ordering of the aforesaid psychological tests.[3]

Shortly after these indictments were handed down, the Commonwealth supplied grand jury minutes to the Board of Registration in Medicine (board) for use in its administrative review of Kobrin's practice. This review included the propriety of prescriptions for benzodiazepines he wrote for certain of his patients including, but not limited to, those patients covered by the indictments. Kobrin's license to practice was summarily suspended in March, 1999, but months later was reinstated pending a final

---

[1]We draw the facts in this section and elsewhere from a nine-volume record appendix and thirty-seven volumes of trial and hearing transcripts, totaling some 9,800 pages.

[2]Medicaid rules in effect at all relevant times required that any psychological testing performed for which reimbursement is sought must be medically necessary.

[3]In addition to charges brought against Kobrin individually, the grand jury indicted PSE Corp. (PSE) and PSE-COR Provider, Inc. (PSE-COR), of one count each of Medicaid fraud based on soliciting and receiving kickbacks from the tenant psychologists. The charge against PSE-COR was subsequently nolle prossed, while the jury ultimately acquitted PSE. PSE apparently did business as PSE-COR Provider, and was incorporated in 1986 as an S-type corporation. Kobrin was the sole stockholder.

hearing on the merits. In February, 2000, after an evidentiary hearing, the board concluded that Kobrin had not illegally prescribed benzodiazepines or otherwise rendered substandard psychiatric care. Kobrin maintained his license to practice until after his 2002 conviction on the three charges at issue in this appeal. His pretrial motion to dismiss the criminal illegal prescribing charges on collateral estoppel grounds was denied, and at trial, he was not permitted to introduce evidence of the board's decision.

Of the eighty-two counts of the indictment, only sixty-four went forward to trial in 2002. Those sixty-four counts consisted of twenty-five counts of violating G. L. c. 118E, § 40 (Medicaid fraud for ordering psychological tests for patients denoted A, B, C, D, and G, as well as three undercover State troopers who posed as drug-seeking individuals); twenty-six counts of violating G. L. c. 118E, § 41 (Medicaid fraud for kickbacks from tenant psychologists); and thirteen counts of violating G. L. c. 94C, § 32B(a) (illegal prescribing of benzodiazepine to patients denoted A, B, C, D, F, and G).

The Commonwealth's theory of the case was, as the prosecutor succinctly stated in his closing, "It's all about money." "It's about giving patients things that they want so they will come back so that he [Kobrin] can bill the Medicaid program." The Commonwealth attempted to prove that Kobrin exploited his patients' vulnerability in a number of ways for his personal profit, while, as it were, "gaming" the Medicaid program in the process. On this view, Kobrin devised a complex money-making arrangement with several interlocking components.

The first such component was said to be Kobrin's receipt of so-called kickbacks from the tenant psychologists. They paid him excessively high rents in return for a steady stream of profitable patient referrals for psychological testing generally reimbursable by Medicare and/or Medicaid. Ostensibly in aid of this, Kobrin established office policies that required new patients to undergo lengthy psychological testing whether the patients needed it medically or not, and routinely scheduled the patients for retesting, whether needed or not, at whatever intervals reimbursement would be available, ordinarily every six months. Another component was for Kobrin to profit from a high volume

of frequent and reimbursable patient visits. To assure this, as well as a patient base that would be available for and cooperate with the psychological testing protocol, another interlocking component was put in place. Kobrin would prescribe to those patients with substance abuse problems the habituating if not addictive drugs known as benzodiazepines, for which Medicaid would often pay, and Kobrin would do so at low dosage levels and in small quantities that would keep this patient population coming back regularly for more of the same. This, in essence, was what the Commonwealth set out to prove.

The jury heard evidence from fourteen Commonwealth witnesses. Among them were witnesses who testified to various aspects of the aforesaid arrangement. Two tenant psychologists who over a number of years had administered tests to numerous patients referred to them by Kobrin, as well as one tenant psychiatrist who worked briefly with Kobrin, testified as to Kobrin's very busy practice, the high rents he charged them, the profitability of the high volume of referrals for reimbursable testing that he made, and the office policies that he set which maximized Medicaid reimbursements. Other witnesses testified to Medicaid claims processes, procedures, and forms; to office procedures regarding billing, scheduling, testing, and retesting; as well as to the financial aspects and profitability of the practice. Two undercover State troopers who had posed as patients with drug abuse issues testified that they were required to undergo psychological testing before being seen by a psychiatrist but that Kobrin had not prescribed them any abusable drugs.

In addition, the jury heard testimony from four experts, two of whom testified as to the standard of care for psychological testing, opining with respect to the psychological tests performed on the patients A, B, C, D, and G that were the subject of the indictments; they deemed the testing procedures manifestly substandard. Two physicians, one a psychiatrist and one a specialist in addiction medicine, also testified as to the standard of care for prescribing benzodiazepines to patients with substance abuse and mental health issues, directing themselves specifically to the indicted prescriptions Kobrin wrote for the patients A, B, C, D, F, and G. In each instance, the experts opined that the conduct fell below the relevant standard of care. The treatment records

of the six patients were among the documents in evidence and formed a basis for the opinions rendered.

Acting on defense motions for required findings of not guilty, the judge disposed of approximately one-third of the sixty-four counts. Forty-three counts went to the jury.[4]

The jury acquitted Kobrin of all twenty-six counts of Medicaid fraud arising from the alleged kickback arrangement with the tenant psychologists. They also acquitted him of the Medicaid fraud counts for ordering psychological testing of Patients A and C, and Trooper D'Amore, and the illegal prescribing counts for prescribing benzodiazepines to Patients A, B, and C. The jury returned guilty verdicts for prescribing a benzodiazepine to Patient D on January 26, 1996, for ordering psychological testing of Patient D that took place on December 22, 1995, and for ordering such testing of Patient G as took place on April 14, 1995.

On appeal, Kobrin claims error in several respects, chief among them that the evidence was insufficient to sustain any of the three convictions.[5] As to the illegal prescribing conviction, Kobrin maintains that the Commonwealth did not adduce sufficient evidence to prove beyond a reasonable doubt that he wrote the January 26, 1996, prescription for Patient D in bad faith and without a legitimate medical purpose to treat Patient D's condition, as the statute and case law require. The evidence was likewise lacking, Kobrin argues, with respect to the Medicaid fraud convictions arising from psychological tests he ordered for Patients D and G: there was no evidence, he asserts, that the two

---

[4] The judge entered required findings of not guilty as to five of six illegal prescribing counts with respect to Patient A, three of six illegal prescribing counts as to Patient C, one of two illegal prescribing counts as to Patient D, all illegal prescribing counts as to Patients F and G, and seven counts of Medicaid fraud, five arising from psychological testing of Patient B, and two from the tests of Troopers Wilder and Cuoco. Although no counts relating to Patients B and F, and no illegal prescribing counts as to Patient G, went to the jury, the exhibits relating to all counts and all patients, over defense objection, were before the jury during deliberation.

[5] He also contends that certain of the judge's jury instructions were erroneous, that his complete exoneration by the board prior to the criminal trial should have barred further criminal prosecution of the illegal prescribing charges, and that he was wrongly convicted by virtue of prosecutorial misconduct and the ineffective assistance of trial counsel. Given the result we reach, we need not address these claims.

tests were medically unnecessary and no evidence that Medicaid was ever billed or that it ever paid for either test. In its cross appeal, the Commonwealth maintains that the trial judge erred in allowing the motion for new trial on the Medicaid fraud counts essentially because the evidence relied upon in ordering the new trial — that claims had not in fact been submitted to Medicaid, nor had Medicaid made any payments as reimbursement for the tests on Patients D and G — was neither newly discovered nor relevant to proof of a necessary element of the crime.

1. *Dr. Kobrin's appeal.* a. *Illegal prescribing.* General Laws c. 94C, known as the Massachusetts Controlled Substances Act (Act), is modeled on its Federal counterpart[6] and imposes criminal liability on "[a]ny person who knowingly or intentionally . . . distributes [or] dispenses . . . a controlled substance . . . ." G. L. c. 94C, § 32B(*a*), as appearing in St. 1982, c. 650, § 8. Physicians duly registered under the Act are exempt from this blanket prohibition insofar as they may "prescribe medically necessary controlled substances." *Commonwealth* v. *Perry*, 391 Mass. 808, 812 n.3 (1984), citing G. L. c. 94C, §§ 7, 9, 18, 19, 24, 25, and 26. General Laws c. 94C, § 19(*a*), inserted by St. 1971, c. 1071, § 1, provides that "[a] prescription for a controlled substance to be valid shall be issued for a legitimate medical purpose by a practitioner acting in the course of his professional practice." The jury found that Kobrin's prescription of a twenty-eight-day supply of one-milligram Klonopin[7] pills to

---

[6]The Uniform Controlled Substances Act of 1970 (CSA), 21 U.S.C. §§ 801 et seq. Forty-seven other States, the District of Columbia, Puerto Rico, and the Virgin Islands have also enacted some version of the CSA. Congress, in passing the CSA, was "particularly concerned with the diversion of drugs from legitimate channels to illegitimate channels," *United States* v. *Moore*, 423 U.S. 122, 135 (1975), and sought to "conquer drug abuse and to control the . . . traffic in controlled substances." *Gonzales* v. *Oregon*, 546 U.S. 243, 269 (2006) (citation omitted).

[7]Klonopin is a member of the benzodiazepine family, often used to treat anxiety and seizure disorders such as epilepsy. The maximum recommended daily dose for adults is between four and twenty milligrams, and one of Klonopin's contraindications is "significant liver disease." A key warning is that "[a]ddiction-prone individuals (such as drug addicts or alcoholics) should be under careful surveillance when receiving [Klonopin]." Physicians' Desk Reference (PDR) 1935-1936 (48th ed. 1994). See note 16, *infra*. This and other relevant segments of the PDR were in evidence.

Patient D on January 26, 1996, did not come within the exemption of G. L. c. 94C, § 19(*a*), and convicted him of violating G. L. c. 94C, § 32B(*a*).

The Act has been construed in a manner sharply contrasting the proof needed to establish a physician's criminal liability under the Act with that which would suffice to establish civil malpractice liability or to warrant disciplinary action by the board.[8] "A physician who issues a prescription not intending to treat a patient's condition in the usual course of his practice of medicine does not issue a valid prescription . . . because he acts in bad faith, in the sense that his purpose is not to treat the patient in accord with accepted medical practice." *Commonwealth* v. *Comins*, 371 Mass. 222, 232 (1976), cert. denied, 430 U.S. 946 (1977).

Because there must be proof of a wrongful criminal intent, however, it is not enough to show that the physician did not comply with accepted medical practice. While such noncompliance "with accepted medical practice is an element of the crime and evidence is admissible that the physician failed to adhere to accepted medical practice, mere malpractice in the prescribing of drugs has not been made a crime. To prove the crime, the physician's purpose, his state of mind, must be shown to have been such that he was not intending to achieve a legitimate medical objective." *Commonwealth* v. *Comins*, *supra*. This is in keeping with the evident legislative purpose of the Act, that of controlling the traffic in controlled substances, both legitimate

---

[8]The behavior of substandard or negligent physicians is regulated by private parties through the civil tort system, see G. L. c. 231, § 60B, and by expert peers through the administrative oversight of the board. See G. L. c. 112, § 5. As to the standard of proof in medical malpractice actions, see *Harlow* v. *Chin*, 405 Mass. 697, 701-703 (1989); *Palandjian* v. *Foster*, 446 Mass. 100, 104-106 (2006); *Glicklich* v. *Spievack*, 16 Mass. App. Ct. 488, 492-495 (1983). As to the board, see *Levy* v. *Board of Registration & Discipline in Med.*, 378 Mass. 519, 524 (1979) (board has "primary responsibility in the regulation of the practice of medicine"). During hearings, the board may utilize the flexibility needed to investigate physicians brought before it, and may draw reasonable inferences from the evidence. See *Arthurs* v. *Board of Registration in Med.*, 383 Mass. 299, 310-313 & n.25 (1981). Judicial review of board decisions is authorized by G. L. c. 112, § 64; in accordance with G. L. c. 30A, § 14, decisions are sustainable when based on substantial evidence. See *Friedman* v. *Board of Registration in Med.*, 414 Mass. 663, 664 (1993). See also *Cobble* v. *Commissioner of the Dept. of Social Servs.*, 430 Mass. 385, 390-391 (1999).

and illegitimate.[9] Physicians who issue invalid prescriptions under G. L. c. 94C, § 19(*a*), then, are those who, in essence, act not as physicians when they write such prescriptions but act instead as "pushers." See *United States* v. *Moore*, 423 U.S. 122, 138 (1975).

The physician's purpose, state of mind, intent — all that bears on the bona fides of the physician's conduct — may not be "susceptible of proof by direct evidence, so resort is frequently made to proof by inference from all the facts and circumstances developed at trial. . . . The question whether the defendant acted in bad faith is a question of fact for the jury." *Commonwealth* v. *Pike*, 430 Mass. 317, 321 (1999) (citations and quotations omitted). The "evidence and the [permissible] inferences . . . must be 'of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt.' " *Commonwealth* v. *Morgan*, 449 Mass. 343, 349 (2007), quoting from *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979). See *Commonwealth* v. *Doherty*, 137 Mass. 245, 247 (1884) ("There is a case for the jury, unless the inference either is forbidden by some special rule of law, or is declared unwarranted because too remote, according to the ordinary course of events"). The jury cannot, however, rely on "conjecture or surmise." *Commonwealth* v. *Cannon*, 449 Mass. 462, 468 (2007), quoting from *Commonwealth* v. *Salemme*, 395 Mass. 594, 599-600 (1985).

In reviewing whether the evidence was sufficient to sustain a conviction, we ask whether the evidence, taken in the light most favorable to the Commonwealth, "was sufficient to satisfy *any* rational trier of fact of the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *Pike*, 430 Mass. at 321. See *Commonwealth* v. *Latimore*, 378 Mass. at 677. When, as here, the review as to sufficiency concerns "the basic ques-

---

[9]The Federal CSA is interpreted in like fashion. Compare *Commonwealth* v. *Comins*, 371 Mass. at 232, with *United States* v. *Limberopoulos*, 26 F.3d 245, 249-250 (1st Cir. 1994), and cases cited. Indeed, in *Comins*, the court relied in part on Federal case law to formulate the Massachusetts illegal prescribing standard. See *Commonwealth* v. *Comins, supra,* citing *United States* v. *Moore*, 423 U.S. at 138-139, 142-143; *United States* v. *Collier*, 478 F.2d 268, 272 (5th Cir. 1973); *United States* v. *Rosenberg*, 515 F.2d 190, 193-195 (9th Cir. 1975), cert. denied, 423 U.S. 1031 (1976).

tion of the bona fides of the defendant's conduct in prescribing the controlled substances which are the subject of the indictment," "the circumstances of the . . . physician-patient relationship are relevant" to the inquiry. *Commonwealth* v. *Comins,* 371 Mass. at 235. See *Commonwealth* v. *Wood,* 17 Mass. App. Ct. 304, 307 (1983), quoting from *Commonwealth* v. *Lozano,* 5 Mass. App. Ct. 872, 873 (1977) ("[I]n 'determining whether the defendant had acted in good or bad faith in giving the prescriptions for which he was convicted, the jury were entitled to consider the words and actions of the defendant throughout the entire course of his dealings with the [patients]' ").

As was the case with all six patients about whom the jury heard evidence, Patient D had been in a patient-physician relationship with Kobrin for a considerable period of time,[10] and like the others, Patient D had both a diagnosed mental illness and a history of abusing alcohol, albeit in his case episodically. At the time of the subject prescription on January 26, 1996, Patient D was thirty-seven years old and had been unemployed and receiving public benefits for many years. Born to a mother with a history of serious mental illness, Patient D's records reflect his beliefs over time that he was being pursued by the Mafia, had been abducted by aliens, was from an ancient asteroid, could read

[10]Patient D's relationship with Kobrin, spanning a decade, was the longest such relationship. Patient A was apparently seen by Kobrin for a bit over two years, beginning soon after Patient A's release from jail. He presented with major depression, anxiety disorder, and avoidant personality disorder. He also had a history of polysubstance abuse, including heroin and alcohol abuse. Patient B was seen by Kobrin in 1994 and had abused alcohol and various illegal drugs since childhood. He was diagnosed with bipolar disorder and antisocial personality disorder; the latter manifested with acute depression and anxiety. Patient C, who had apparently met with Kobrin some ninety-five times before August of 1992, treated with him until 1995. She presented with anxiety and a seizure disorder, a history of having been abused by her family of origin and foster parents, recurrent major depressive disorder, benzodiazepine dependence, and a long history of alcohol abuse. Patient F saw Kobrin between 1990 and 1993, was diagnosed as having a schizoid personality disorder, and had a significant history of heroin and alcohol abuse. Patient G saw Kobrin between early 1993 and late 1995; he was apparently HIV positive and suffered from anxiety, agoraphobia, depression, and alcohol dependency. All were at various times prescribed a benzodiazepine by Kobrin at low dosage levels and in small quantities sufficient to last until the next office visit.

minds, and that others could insert thoughts into his. He was diagnosed with schizophrenia, severe anxiety, mania, paranoia, and depression.

Patient D began seeing Kobrin in 1986 and saw him on a regular basis until mid-1991, when D went to California. Upon his return approximately six months later, D resumed seeing Kobrin on a regular basis until the end of March, 1993, when he sought care from other providers. Roughly a year after that, he left for California again in the summer of 1994, returning to Massachusetts in December, 1995. Upon his return, he went to a local hospital emergency room and was transferred to and admitted as an inpatient at the John C. Corrigan Mental Health Center (Corrigan),[11] a local mental health facility. Thereafter, upon being discharged from Corrigan with an outpatient treatment plan from that facility, he was referred to Kobrin after an almost three-year absence. He saw Kobrin on December 22 and 29, 1995, and on January 11 and 26, 1996. D did not return for further office visits; there is no evidence as to the reason.[12]

Over the course of this treatment history, spanning almost ten years, Kobrin referred Patient D to psychologists in his office for psychological testing on three occasions: December 29, 1986, November 13, 1987, and December 22, 1995.[13] The December 22, 1995, testing was done on the same day that Patient D first returned to see Kobrin after three years away. The psychologist's report from that testing stated in part that D:

> "indicated no history of drug abuse, but was positive for a

[11]Corrigan is a mental health inpatient, outpatient, and emergency facility run by the Massachusetts Department of Mental Health. It accepts patients who are unable to pay for services. A Corrigan social worker's note dated December 19, 1995, indicates that Patient D "has a long history of mental illness. He has been in and out of hospitals for years. Bridgewater, Taunton State, and Urgent Care, California to name a few."

[12]Patient D's autopsy report was in evidence. It indicates that he died of an overdose of morphine on or about March 28, 1996, some two months after his last visit with Kobrin. (There was no evidence that Kobrin had ever prescribed him morphine.) Although there was alcohol in his stomach as well, there was no evidence that benzodiazepines were detected.

[13]With the exception of Patient A, who was referred for testing five times in approximately twenty-seven months, the record does not reflect that Patients B, C, D, F, or G were re-tested on the periodic basis which the Commonwealth's witnesses testified Kobrin had established.

history of alcohol abuse. He indicated that while in California he routinely drank two 40 ounce bottles of malt liquor at a time. According to [D], his alcohol difficulties are not constant but rather episodic. According to him, 'I drink when something bothers me.' He has not been to any detox programs. He presently is not drinking because he would be asked to leave [the shelter where he was staying] if he did. He last drank 3 weeks ago on the train coming from California."

From the time in 1986 when Kobrin first saw Patient D until January 26, 1996, when he last saw D, Kobrin wrote numerous prescriptions for him,[14] treating him for his diagnosed paranoia, schizophrenia, severe anxiety, mania, and depression. The medicines Kobrin prescribed over time included antipsychotic drugs such as Stelazine and lithium, the anticonvulsant Depakote, and the benzodiazepine Klonopin.[15] The twenty-eight Klonopin prescriptions he wrote for D between January 28, 1992, and January 26, 1996 (with the significant hiatus between March 29, 1993, and January 11, 1996, noted *infra*), were invariably accompanied by prescriptions for antipsychotic and other medications. The Klonopin prescriptions were uniformly at the same dosage level, four milligrams per day[16] and, like the psychotro-

---

[14]The Commonwealth introduced records of prescriptions written by the defendant for Patient D beginning on January 28, 1992, although Kobrin began seeing Patient D in 1986 and, apparently, prescribed essentially the same types of drugs at essentially the same dosage levels and for comparable intervals.

[15]Kobrin testified that he prescribed Klonopin to Patient D for two reasons: to treat his diagnosed anxiety (a condition that no expert appears to question) and to treat akathisia, a side effect of the medications used to treat schizophrenia. Akathisia is "a state of violent urges and agitation." *Commonwealth* v. *Shuman*, 445 Mass. 268, 271 (2005). Kobrin argues on appeal that no expert addressed or countered the legitimate medical purpose of using Klonopin to treat akathisia. However, Kobrin wrote in treatment notes in 1986 that, after treatment, Patient D "no longer ha[d] akathisia." Despite a later reference on May 2, 1988, to akathisia in a treatment plan for Patient D, there is no reference in Kobrin's subsequent treatment notes to the condition. Given our analysis, we do not address the matter further.

[16]The PDR at 1936 (see note 7, *supra*) states that the maximum daily dosage should not exceed twenty milligrams to control seizures, while the Commonwealth's experts opined that the maximum dosage to treat anxiety should be within four and six milligrams per day.

pic drugs, were written for the intervals between office visits. Between January 28, 1992, and January 18, 1993, the prescriptions were for a fourteen- to fifteen-day supply, while between February 2, 1993, until March 29, 1993, the prescriptions were for a thirty-day supply. The next prescriptions for Klonopin and the psychotropic drugs that Kobrin wrote for D were on January 11 and 26, 1996. The January 11 prescription was for fourteen days while the January 26 prescription was for twenty-eight days.

In the periods of time when Patient D was in California and received medical treatment there (six months in 1991, and approximately eighteen months in 1994 and 1995) and when he sought treatment from providers other than Kobrin (from April, 1993, until the summer of 1994, he was seen by Dr. Almeida and a psychiatrist, Dr. Sousa — and, upon his return from California in December, 1995, he was seen by Corrigan doctors including Sousa), the medication regime prescribed for Patient D by the various providers remained largely the same, including the prescription for Klonopin. When Patient D was discharged from Corrigan on December 19, 1995, his outpatient treatment plan included prescriptions written by Sousa, including Klonopin at the usual dose. Because Patient D already had the medications that Sousa prescribed, Kobrin wrote no prescriptions when he met with Patient D on December 22 and 29, 1995, first resuming the prescriptions on January 11, 1996, for the same medications that Sousa had prescribed.

The Commonwealth's experts, the psychiatrist Dr. Kleber and the addiction medicine specialist Dr. Pasanen, took a very dim view of this prescribing practice, which they thought dangerous, contrary to prescribing protocols for substance abusers, and well below the standard of care. Distilled to its essence, their opinion was that, while an appropriate drug in many instances for treating anxiety and while less abusable than Xanax, benzodiazepines generally should not be prescribed, at least on an outpatient basis, for patients who have a history of or who are actively abusing alcohol, even if prescribed at dosage levels within PDR limits.

Pasanen testified that the continued use of benzodiazepines like Klonopin, often sought after by substance abusers, can be habit-forming, if not addictive, even at low doses. The use of

benzodiazepines by alcoholics can amplify both the alcohol addiction and the risk of dependency on the medication. That Kobrin knew of Patient D's documented history of episodic alcohol abuse and, given his treatment notes of January 26, 1996 (reflecting Patient D's disclosure to him of drinking "2 40 oz. beers at night"), that he knew of D's current level of alcohol consumption, yet still prescribed a twenty-eight-day supply of Klonopin "ma[de] no sense whatsoever" to Pasanen. He opined that the prescription did "not meet [the] standard of care, and I can't see a legitimate purpose."

Kleber testified that benzodiazepines can prompt alcohol abusers to fall from abstinence and are destabilizing. The risks associated with benzodiazepines are increased when taken by one using alcohol, and the amplified effect of the two substances together — another way of getting high — can increase the likelihood of a relapse from sobriety. Due to the risks associated with mixing alcohol and benzodiazepines, close monitoring is necessary when prescribing a benzodiazepine to an active alcohol abuser. Kleber testified that he could not "get a picture of where . . . Kobrin wanted to go with [Patient D]," that Patient D was not improving, and that while the January 26, 1996, Klonopin prescription followed the treatment plan established weeks earlier at Corrigan, each mental health professional is responsible for undertaking an independent analysis of the patient's needs; accordingly, in Kleber's view, Kobrin should have tried alternative treatment for D. Kleber acknowledged that the other medications Kobrin prescribed contemporaneously with Klonopin were in aid of medical treatment for Patient D's undisputed diagnosed conditions; that he [Kleber] did not "recall ever having said that [Kobrin] gave the medications to any of the patients so they could abuse them . . . or sell [them]"; and that the mental health professionals at Corrigan were also aware of Patient D's current alcohol use when they formulated the outpatient treatment plan for D which included Klonopin. Nevertheless, Kleber opined that the January 26, 1996, Klonopin prescription was below the standard of care.

The Commonwealth maintains that, viewed in its most favorable light, the entirety of the evidence before the jury permitted them to conclude beyond a reasonable doubt that Kobrin had

acted in bad faith and without a legitimate medical purpose when, on January 26, 1996, he prescribed for Patient D a twenty-eight-day supply of one-milligram Klonopin pills. The expert testimony of Drs. Kleber and Pasanen established that it was below the standard of care to prescribe even low-dose, short-supply Klonopin to substance abusers and alcoholics. Even if it were nonetheless within the realm of Kobrin's discretionary medical judgment to prescribe low-dose Klonopin to address Patient D's anxiety, the PDR for Klonopin warns of the need for close monitoring when the patient is a substance abuser or alcoholic. Given this and Kobrin's knowledge of Patient D's history of alcohol abuse and recent reports of heavy drinking, the Commonwealth maintains that the jury could reasonably have inferred bad faith and the absence of legitimate medical purpose from the fact that Kobrin prescribed not a short supply of pills accompanied by close monitoring, but a twenty-eight-day supply without follow-up. Moreover, the Commonwealth contends, Kobrin's disregard for his patient's welfare may also be inferred from evidence of other financially motivated medical decision-making, i.e., ordering medically unnecessary psychological testing for his patients not for their benefit but for his own personal profit.

Both the Commonwealth and Kobrin rely on *Commonwealth v. Pike*, 430 Mass. 317 (1999), in support of their respective positions. *Pike* also involved the conviction of a psychiatrist for illegally prescribing controlled substances, including Klonopin. The court rebuffed Pike's challenge to the sufficiency of the evidence to prove "the crucial intent elements," i.e., "bad faith and lack of legitimate medical purpose in prescribing the drugs to his patients." *Id.* at 321. Well-credentialed medical experts in the fields of psychiatry, addiction treatment, and psychopharmacology testified that the "extremely high dosage levels" and the frequency with which Pike wrote prescriptions for drugs such as Klonopin and methadone (refilling prescriptions before the time period of the prior prescription had expired, giving new prescriptions to patients who claimed they had been lost or stolen) "served no legitimate medical purpose," and that Pike's prescribing practices "were not designed actually to treat the patients' underlying problems." *Id.* at 319. In addition to the expert medical opinions to the effect that Pike's treatment of his patients fell

well below the standard of care and was unwarranted and danger-
ous, there was documentary evidence that

> "contained a plethora of underlying facts which . . .
> demonstrated that [Pike] had prescribed highly addictive
> drugs, often specifically requested by name by his patients,
> in short intervals and at dangerously high dosage levels in
> a manner which served no legitimate medical purpose in
> relation to the medical problems the patients presented.
> Moreover, contrary to acceptable medical practices, [Pike]
> prescribed drugs for 'chronic pain' without any supporting
> objective evidence that his patients suffered from this
> problem. Finally, [Pike] continued to prescribe drugs to
> patients who made suspicious claims of lost, stolen, or
> destroyed prescriptions within days of being issued the
> original prescriptions."

*Id.* at 322.

In concluding that the Commonwealth's evidence and the
reasonable inferences that could be drawn from it were suf-
ficient to sustain Pike's illegal prescribing convictions, the court
noted, "We have previously upheld convictions based on some-
what similar evidence." *Ibid.* The same cannot be said for the
case now before us.

The medical experts here did not dispute that Patient D suf-
fered from significant mental illness; nor did they quarrel with
Kobrin's treatment of the diagnosed conditions, except with
respect to the prescription of Klonopin for Patient D's anxiety.
On that point, their view was that while Klonopin at the pre-
scribed dosage level might be appropriate treatment for anxiety
in a different patient population, it was "extraordinarily wrong"
for active alcohol abusers like D. They also agreed that Klonopin
is not a drug that should be abruptly stopped in a patient who
has been taking it for some time; tapering is the solution. That
being said, while the experts' opinions certainly sufficed to es-
tablish Kobrin's failure to comply with accepted medical practice,
there is, unlike *Pike*, little more in the evidence to sustain the
"crucial intent elements." *Id.* at 321.

There was no evidence to suggest that Kobrin prescribed to
Patient D (or to any other patient, for that matter) at intervals
overlapping prior prescriptions or between office visits, that he

wrote new prescriptions to replace any claimed to be lost or stolen, or that he prescribed in dosages beyond the recommended range — actions inconsistent with legitimate medical purpose. Contrast *Commonwealth* v. *Miller*, 361 Mass. 644, 648-649 (1972)[17]; *Commonwealth* v. *Comins*, 371 Mass. at 233; *Arthurs* v. *Board of Registration in Med.*, 383 Mass. 299, 305-309 (1981); *Commonwealth* v. *Pike*, 430 Mass. at 319; *Commonwealth* v. *Lozano*, 5 Mass. App. Ct. at 872-873; *Commonwealth* v. *De La Cruz*, 15 Mass. App. Ct. 52, 54-55 (1983); *Commonwealth* v. *Wood*, 17 Mass. App. Ct. at 305-306 & n.1 (dentist defendant wrote four prescriptions in a week to one patient for a total of sixty tablets of Percodan and similar prescriptions for others without evident medical need). Nor was there evidence that Patient D had requested a benzodiazepine generally, or Klonopin specifically, or that Kobrin asked Patient D his preference of medicine. Contrast *Commonwealth* v. *Comins*, 371 Mass. at 228-229; *Commonwealth* v. *Pike*, 430 Mass. at 320; *Commonwealth* v. *De La Cruz*, 15 Mass. App. Ct. at 54-55. There was no evidence that Kobrin ever instructed Patient D to fill prescriptions at different or distant pharmacies to avoid detection by the authorities. Contrast *Commonwealth* v. *Miller*, 361 Mass. at 648-649; *Commonwealth* v. *Comins*, 371 Mass. at 229. There was no evidence that Patient D ever abused, overused, or used Klonopin contrary to the manner it had been prescribed for him or, if he ever had, that Kobrin knew of it. Contrast *Commonwealth* v. *Miller*, 361 Mass. at 648-649; *Commonwealth* v. *Comins*, 371 Mass. at 229-230[18]; *Commonwealth* v. *Pike*, 430 Mass. at 319-320. Nor was there any evidence that

[17]In *Commonwealth* v. *Miller*, *supra*, the defendant physician also gave an undercover officer barbituates packaged in plastic wrap, as well as syringes and cocaine, underscoring her departure from legitimate medical practice.

[18]In *Commonwealth* v. *Comins*, 371 Mass. at 232-233, the court looked to Federal case law for guidance on the nature and quantum of evidence sufficient to prove illegal prescribing. See, e.g., *United States* v. *Bartee*, 479 F.2d 484, 489 (10th Cir. 1973); *United States* v. *Badia*, 490 F.2d 296, 297 (1st Cir. 1973); *United States* v. *Larson*, 507 F.2d 385, 387-388 (9th Cir. 1974); *United States* v. *Green*, 511 F.2d 1062, 1066 (7th Cir. 1975), cert. denied, 423 U.S. 1031 (1976); *United States* v. *Rosenberg*, 515 F.2d at 199; *United States* v. *Ellzey*, 527 F.2d 1306 (6th Cir. 1976). These cases all reflect facts and circumstances similar to those encountered in *Comins*. (E.g., medicines requested by name by patients without symptoms, medicines prescribed with frequency far exceeding recommended dose, patients asked by physician to

Patient D had ever traded, sold, or given his Klonopin to anyone else, or that he had ever lied to Kobrin about anything regarding his prescriptions. Contrast *Commonwealth* v. *Pike*, 430 Mass. at 320; *Commonwealth* v. *De La Cruz*, 15 Mass. App. Ct. at 54-55. There was no evidence that Kobrin made incriminating statements regarding his prescribing practices, or that he was dishonest with others about them. Contrast *Commonwealth* v. *Pike*, 430 Mass. at 321; *Commonwealth* v. *Lozano*, 5 Mass. App. Ct. at 872-873; *Commonwealth* v. *Wood*, 17 Mass. App. Ct. at 305. No evidence established that Kobrin ever supplied his patients with unmarked or illicit drugs or other controlled substances. Contrast *Commonwealth* v. *Miller*, 361 Mass. at 648-649.

The state of the evidence here, apart from the expert opinion testimony, is that Kobrin prescribed a twenty-eight-day supply of a potentially destabilizing drug to a known alcohol abuser who was apparently teetering on the edge of sobriety and that Kobrin did so without making any known provision for monitoring the patient. In order to conclude that Kobrin wrote this prescription in bad faith, absent a legitimate medical purpose to treat Patient D's condition, the jury would have had to draw a number of adverse inferences.

There was no evidence before the jury as to any appointment for Patient D to see Kobrin after January 26, 1996. While there was evidence that D did not return after that date, no explanation was given for this. Given the prescribing history over the preceding decade, the records reflect office visits coinciding with renewal dates for prescribed medication. It would be as much based on conjecture for the jury to infer that no appointment had been made as that one had been made but D failed to keep it. The absence of evidence on the point does not permit the jury to conclude that no provision had been made for follow-up care.

More to the point, however, is whether the jury could fairly infer that prescribing a twenty-eight-day supply itself — as

fill prescriptions at distant or varied pharmacies, separate records kept by physician to enable same medicines to be prescribed to same patients twice in one day, drugs prescribed to patients who admitted that they sold their prescriptions, and prescriptions traded by physicians for goods or services not in the nature of a professional fee.)

opposed to a shorter supply, which, like the twenty-eight-day supply, would avoid abrupt withdrawal, but would also provide an interim office visit to monitor the drug use — reflects such an abandonment of medical judgment, such a degree of disregard for Patient D's welfare, as to constitute bad faith prescribing absent a legitimate medical purpose. This, too, would require considerable conjecture on the part of the jury. Patient D's treatment and prescription records reflect that January 26, 1996, was not the first time that Kobrin had prescribed Klonopin (along with psychotropic and other drugs) for Patient D at such an interval; he had done so at least three times in 1993. There was no evidence that Patient D had ever (or that Kobrin knew he had) misused or overused or even used Klonopin differently when given a thirty-day supply, as opposed to when he had been given a fourteen-day supply, or when he was in a period of heavy drinking. Moreover, the expert medical testimony was to the effect that prescribing short supplies of benzodiazepines with frequent office visits does not itself constitute close monitoring of a patient. This is consistent with the Commonwealth's theory of the case — that Kobrin prescribed such drugs in short supplies not to closely monitor his patients but, rather, to keep his patients coming back often. It would appear, therefore, that on this evidence, prescribing a longer twenty-eight-day supply is no more the absence of close monitoring than is prescribing a short supply the equivalent of close monitoring. Moreover, a contrary view would be inconsistent with the Commonwealth's theory of the case.

Even if these were nonetheless permissible inferences and could be combined with an inference as to Kobrin's financial motivations, the problem is yet more fundamental. The evidence as described, without more, does not suffice to prove that Kobrin wrote the prescription at issue absent an intention to achieve a legitimate medical objective. The "crucial intent elements," *Commonwealth* v. *Pike*, 430 Mass. at 321, that must be established beyond a reasonable doubt cannot be collapsed into and proven simply by evidence of profitable and bad medical decision-making. Having even a keen profit motive does not itself denude a physician of the intention to treat medically a patient's condition, even if the physician does so negligently. We are not aware of any

case, certainly none in Massachusetts, where a physician has been held criminally liable for prescribing a controlled substance in circumstances such as these, on evidence as slender and tenuous as here. The conviction cannot stand.

b. *Medicaid fraud: psychological testing.* The defendant was convicted of two counts of Medicaid fraud for ordering psychological testing of Patient D on December 22, 1995, and of Patient G on April 14, 1995. The same tenant psychologist, Greene, performed both tests. The defendant claims on appeal that the trial judge erred in denying his motion for required findings of not guilty because the evidence was insufficient to prove both that the test referrals were medically unnecessary and that reimbursement claims for the tests were ever in fact submitted to or processed by Medicaid.

In assessing the sufficiency of the evidence, we look to the evidence as it stood at the time of trial and do not consider any evidence that became available thereafter. We then view the trial evidence in the light most favorable to the Commonwealth, employing the familiar *Latimore* standard. 378 Mass. at 676-678.

i. *Medically unnecessary testing.* On appeal, Kobrin contends that the Commonwealth failed to put before the jury any evidence showing that there was no medical need for Patient D and Patient G to have had these two specific tests at the times ordered. As he points out, neither of the Commonwealth's two expert witnesses in the field of psychological testing ever directly opined that the tests at issue were medically unnecessary. The Commonwealth, however, contends that other evidence, taken in its entirety, would permit the jury reasonably to infer that such was the case.

The Commonwealth's theory on the psychological testing indictments was that Kobrin, in violation of G. L. c. 118E, § 40, caused false statements or representations to be made (i.e., that the tests were medically necessary) for use in determining rights to payment under Medicaid. On this theory, Kobrin rented space to Greene for an excessive amount of rent and, in return, referred his Medicaid patients to Greene for psychological testing, whether or not they medically needed such tests. To this end, he instituted and oversaw office policies ensuring that such patients were automatically scheduled for testing without

individual consideration of each patient's medical condition.[19] Kobrin assured Dr. Katz, another tenant psychologist, that "Medicaid is very lucrative [in Massachusetts]," guaranteed him "four times the rent in referral . . . money," and told him that "we see very disturbed patients here, . . . [m]ake sure you see them as disturbed."

The expert psychologists opined that the testing performed by the tenant psychologists, including Greene, was manifestly substandard, producing test results that were generally not useful. Moreover, Kobrin did not individualize the testing he ordered by posing specific referral questions; as a result, nearly every patient got the same battery of tests. Lastly, although the test results reported to Kobrin sometimes contained conflicting information at variance with prior tests of the same patient, Kobrin did not address evident shortcomings in the tests. He neither referred to the test results in his treatment notes nor factored the results into or otherwise altered his treatment of patients tested.[20] Taking this evidence in the light most favorable to the Commonwealth, we cannot say that the judge was wrong to think that the jury could reasonably have inferred Kobrin knew that the two tests were not medically necessary when he made the referrals.

ii. *Actual submission of claims to Medicaid.* Turning to Kobrin's contention that the trial evidence did not suffice to prove that reimbursement claims for the two tests had in fact been made, we consider the following. The trial judge, without objection, had instructed the jury that, in order to find Kobrin guilty of violating G. L. c. 118E, § 40, they must find beyond a reasonable doubt, inter alia, that "a claim form was filed within the dates mentioned within the indictment for payment from the Medical Assistance Program of [*sic*] psychological testing for a particular patient . . . that the claim form contained a repre-

[19]Patient D was tested on the same day as his first appointment to see Kobrin in almost three years. This would be consistent with the evidence that "new" patients were automatically scheduled for testing on the first visit to the office. Patient G's treatment records suggest a similar resumption of treatment with Kobrin contemporaneous with the psychological testing administered on April 14, 1995.

[20]In entering a required finding of not guilty on the charge that Kobrin had illegally prescribed benzodiazepines to Patient G on September 1, 1995, however, the trial judge observed that the April 14, 1995, psychological evaluation had prompted Kobrin to order drug screens on G, with negative results.

sentation that the testing was medically necessary . . . [and] that the defendant knew that the representation was material and . . . false . . . when he caused the . . . representation to be made." As to all other indicted psychological testing ordered, the Commonwealth offered in evidence so-called MA-9 Medicaid applications documenting that the psychologist administering each test had submitted a reimbursement claim to Medicaid for it. This was not so for the two tests at issue, the only tests as to which Kobrin was convicted.

In denying Kobrin's posttrial motion for a required finding of not guilty, the judge concluded that the Commonwealth had proved the actual claim submitted element by means of circumstantial evidence. This is permissible, but such proof cannot rest on evidence requiring a leap of conjecture. See *Commonwealth v. Merola*, 405 Mass. 529, 533 (1989); *Commonwealth v. Latney*, 44 Mass. App. Ct. 423, 426 (1998). Without using the gift of twenty-twenty hindsight, and limiting our review to the evidence at trial, we cannot say the judge was incorrect in denying the motion, though the question is a close one.

There was evidence that Patients D and G, at the times of testing, were receiving both Medicaid and Medicare assistance. The tenant psychologist Greene, an immunized witness, was called by the Commonwealth. He testified that he was a Medicaid provider, that he generally applied for and received reimbursements from Medicaid for psychological testing, and that he had administered the subject tests to Patients D and G. He did not, however, testify that he had in fact submitted claims to Medicaid for the two tests at issue. An office administrator at Kobrin's office testified that reimbursement claims were regularly sent to Medicaid from Kobrin and the tenant health care providers. In addition, there were computer spreadsheets in evidence representing billings by the tenant providers that contained numerous opaque codes that were left largely unexplained. The spreadsheets listed plainly enough, however, claims for the subject tests as having been made to "MCARE." Based on this, the judge reasonably concluded that the jury could rationally have inferred Greene had submitted bills to Medicaid for payment of the subject two tests as well as the other tests, and that neither the absence of MA-9 forms nor the largely unexplained

printouts rendered that inference impermissible guesswork. There was no error in the denial of the motion for a required finding on the Medicaid fraud counts.

2. *The Commonwealth's cross appeal.* The Commonwealth maintains that the trial judge erred in ordering a new trial on Kobrin's two Medicaid fraud convictions. A judge entertaining a motion for new trial "may grant a new trial at any time if it appears that justice may not have been done." Mass.R.Crim.P. 30(b). "[A]n appellate court will examine the motion judge's conclusion only to determine whether there has been a significant error of law or other abuse of discretion." *Commonwealth* v. *Grace*, 397 Mass. 303, 307 (1986). Such motions are "addressed to the sound discretion of the trial judge . . . [and] [r]eversal for abuse of discretion is particularly rare where the [motion] judge . . . was also the trial judge." *Commonwealth* v. *Acevedo*, 446 Mass. 435, 441-442 (2006) (citations omitted). See *Commonwealth* v. *Grace*, *supra* (such a judge entitled to "special deference"). Only if the judge's decision proves manifestly unjust will we reverse. *Commonwealth* v. *Moore*, 408 Mass. 117, 125 (1990).

Granting Kobrin a new trial on the Medicaid fraud convictions followed upon evidence developed during posttrial discovery that had been allowed in furtherance of his rule 30(b) motion. This evidence made plain that no reimbursement claims for the subject tests had ever been submitted to Medicaid; Greene had instead filed claims with Medicare and those claims were neither processed nor paid by Medicaid.[21] Although one basis for the Commonwealth's cross appeal is its view that actual

[21]The evidence revealed during posttrial discovery conducted by Kobrin's appellate counsel included the following. In paying providers for services, Medicare and Medicaid can operate both independently and in conjunction with each other. When only Medicaid will pay, the provider submits an MA-9 Medicaid application form to Medicaid. Because Medicaid is a payor of last resort, however, the provider to a dually-eligible patient will initially file a claim on an HCFA-1500 form with Medicare. If Medicare does not pay the full amount requested it may electronically transmit a "crossover" claim to Medicaid, but the latter's receipt and approval of any such crossover claim depend on a number of factors, including whether certain information about the patient's Medicaid account had been supplied to Medicare by the provider in the first instance. For example, as to Patient D's testing, Dr. Greene did not include information on the HCFA-1500 form he submitted to Medicare that would have been necessary for Medicare to have made a crossover claim. In

claim submission to Medicaid is *not* an element of the crime that it must prove, it came to this view well after trial. As noted earlier, the Commonwealth voiced no objection to the judge's instruction requiring proof of actual claim submission to Medicaid and relied on the above described circumstantial evidence to sustain its burden. Passing on whether this alone might defeat the Commonwealth's belatedly adopted position, cf. *Commonwealth* v. *Salemme*, 395 Mass. at 598 (prosecution waived joint venture theory), we address each of the Commonwealth's contentions.

A. *Compliance with rule 30.* In allowing the new trial, the trial judge recognized the impact of what he viewed as newly discovered evidence, concluding that it cast real doubt on the justice of the two convictions and would probably have been a real factor in the jury's deliberations.

i. *Newly discovered information.* The Commonwealth contends that the judge should not have taken the new information into consideration at all because it was not newly discovered insofar as not unavailable to the defense at the time of trial. "A defendant seeking a new trial on the ground of newly discovered evidence must establish both that the evidence is newly discovered and that it casts real doubt on the justice of the conviction." *Commonwealth* v. *Grace*, 397 Mass. at 305. "Evidence is considered 'newly discovered' . . . only if it was 'unknown and unavailable at the time of trial despite the diligence of the moving party.'" *Wojcicki* v. *Caragher*, 447 Mass. 200, 213

any event, if Medicare paid the full amount of the claim, there would be no crossover claim submitted to Medicaid. At all relevant times, the subject psychological testing was fully covered by Medicare and no residual costs would have crossed over to Medicaid.

The billing code for the type of testing, #90830, denoted the testing performed on Patients D and G both on the HCFA-1500 forms and on internal office spreadsheets. At all relevant times, this code was a Medicare billing number only; it was never a Medicaid number. Further, all paper crossover claims generated a so-called MA-2 form; Medicaid did not have in any of its records any indication that it had received an MA-2 form for either of the subject claims. Moreover, all crossover claims are assigned a specific "transaction control number" (TCN) by Medicaid. An exhaustive search of Medicaid records was undertaken by a designated expert at Medicaid regarding its billing procedures and records. Although able to locate TCNs for other services that had been provided to Patients D and G at Kobrin's office suite, *no* TCN existed for the subject testing.

(2006), quoting from *Leavitt* v. *Mizner*, 404 Mass. 81, 89 (1989). The motion judge must also be satisfied that the evidence "would probably have been a real factor in the jury's deliberations." *Commonwealth* v. *Grace, supra* at 306.

The Commonwealth's insistence that it would not have been impossible for counsel to have uncovered the new evidence before trial is wide of the mark. A defendant need not jump quite so high a hurdle. Kobrin was only required to — and did — show that reasonable diligence would not have led his trial counsel to the material. *Commonwealth* v. *Grace, supra.* The Commonwealth's further contention — that the judge erred in not explicitly finding the material unavailable — also falls by the wayside. The judge took pains in his memorandum to under-score appellate counsel's extensive discovery efforts and the "exceptional energy" expended. The new evidence that appel-late counsel unearthed from "third party billing specialists" knowledgeable about "arcane nomenclature, complex proce-dures associated with a provider reimbursement application, and how the Medicare and Medicaid systems interact in reviewing a provider's payment claim" "surpasse[d] information actually or constructively known by [the] defendant or his [trial] counsel in 200[2]," and provided evidence "superior in objectivity, depth, and persuasive force" in comparison with the information avail-able in the defendant's office. Indeed, the judge observed that the absence of the information obtained posttrial had deprived the defendant of significant defenses. The judge's quoted com-ments adequately convey his view that reasonable diligence would not have led trial counsel to the new evidence. No more was necessary.

ii. *Doubt as to the justice of the convictions.* Finally, the Commonwealth argues that, even if the judge permissibly con-sidered the subject evidence, it was error to grant a new trial. We disagree. Beyond the considerable deference we must extend to the judge, it is readily apparent that the evidence "would probably have been a real factor in the jury's deliberations." *Commonwealth* v. *Grace*, 397 Mass. at 306. The jury were asked to decide whether the prosecution had proved beyond a reasonable doubt that Greene had submitted reimbursement claims to Medicaid. Comparing the evidence that was before

the jury to that discovered later, a "substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial" is manifest. *Ibid.* The basic question before the judge was whether justice had not been done at trial,[22] and we discern no basis to disturb his reasoned decision.

B. *Proof of actual claim submission.* The Commonwealth's second basis for maintaining that the judge erred in granting a new trial is that the newly discovered evidence is, in essence, irrelevant. The Commonwealth now takes the view that it was required to prove too much at trial and that, in fact, it was not necessary for it then to have proved that claims had actually been submitted to Medicaid for any of the indicted psychological tests, including the subject testing of Patients D and G. The Commonwealth is mistaken.

General Laws c. 118E establishes, inter alia, the Medicaid program in the Commonwealth. Section 40, inserted by St. 1993, c. 161, § 17, addresses Medicaid fraud by service providers. It prohibits "[a]ny person who furnishes . . . services for which payment may be made under [G. L. c. 118E]" from "knowingly and willfully" making or causing to be made two types of false statements. The first clause of § 40 prohibits "any false statement or representation of a material fact in any application for any benefit or payment [under c. 118E.]" The second clause of

___

[22]Kobrin argues that the judge's extensive reading to the jury, midway through the trial, of the Medicaid regulations (encompassing twenty-two pages of transcript), together with the judge's repeated instruction that "regulations have the authority of law," left the jury with the impression that providers are always required to comply with Medicaid regulations in processing reimbursement claims and that failure to do so would be a violation of law. Unlike reimbursement sought for the other indicted psychological testing, which was submitted in accordance with Medicaid procedures and as to which Kobrin was acquitted, reimbursement for the two psychological tests concerning which he was convicted were submitted to Medicare; the Medicaid regulations were, therefore, irrelevant as to the latter two tests. Kobrin suggests that the judge's flawed instruction set him up "for almost an automatic conviction on these two tests." While Kobrin did not object to the instruction at trial, the judge may well have implicitly factored this into his analysis on the motion for new trial. In concluding that the newly discovered evidence cast real doubt on the justice of the conviction, the judge may also have taken into account the Commonwealth's failure at trial to distinguish Medicare from Medicaid reimbursement claims, the failure to explain how the crossover process works, and the Commonwealth's apparent suggestion that MA-9 forms for the subject two tests had perhaps merely been lost or misplaced.

§ 40 prohibits "any false statement or representation of a material fact for use in determining rights to such benefit or payment." The Commonwealth did not proceed against Kobrin under the first clause because the tenant psychologists and not Kobrin performed the tests and it was they who sought any reimbursement for the tests. The Commonwealth instead proceeded against Kobrin under the second clause of § 40, on the theory that he made false statements or representations by signing forms used to refer patients for psychological tests that were stated to be but were not medically necessary. The Commonwealth contends that proof of actual claim submission to Medicaid is not required in order to show violation of the second clause of § 40.

The question has not previously been decided. We interpret the statute "according to the intent of the Legislature 'ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main objective to be accomplished.' " *Sperounes* v. *Farese*, 449 Mass. 800, 804 (2007), quoting from *Hanlon* v. *Rollins*, 286 Mass. 444, 447 (1934).

The language of the second clause of c. 118E, § 40, like the first clause, targets those who "knowingly and willfully make[] or cause[] to be made any false statement or representation . . . ." The next phrase in the second clause — "for use in determining rights to such benefit or payment" — modifies the phrase "false statement or representation." In other words, only those false statements or representations that are to be used in determining benefit or payment rights fall within the purview of the statute.

Looking to other sections of c. 118E to shed light on the second clause of § 40, we see that the "determining" entity is the Executive Office of Health and Human Services Division of Medical Assistance (division). As pertinent here, the division is the sole overseer of Medicaid matters, determining eligibility of program participants and disbursing funds. See G. L. c. 118E, §§ 1, 2, 7, 9, 27. Providers must "submit . . . a bill" to the division within ninety days of rendering the subject medical services in order to receive payment (i.e., reimbursement). G. L.

c. 118E, § 38, inserted by St. 1993, c. 161, § 17. The only way that false statements would be used in determining rights to benefits or payments is if they were submitted to the division in connection with a requested reimbursement. That submission of a claim is contemplated for liability to be triggered under either the first or second clause of G. L. c. 118E, § 40, is further clarified by G. L. c. 118E, § 46A, which shields providers from criminal liability in certain circumstances. "*Any provider making a claim for payment* under [the Medicaid program], which is not *submitted* in compliance with the billing policies and procedures of said program," will not be prosecuted if the "*submission of the claim* was due solely to a clerical or administrative error" (emphasis added). G. L. c. 118E, § 46A, as amended by St. 2000, c. 159, § 226.[23]

The Commonwealth takes issue with this straightforward reading, which guided the trial judge's jury instruction. The Commonwealth calls attention, first, to the focus in G. L. c. 118E, § 40, on falsity and misrepresentation rather than on financial injury to the Commonwealth, a point that in our view does not in any way detract from the clear statutory purpose of deterring and punishing fraud that brings about the unwarranted disbursement of limited Medicaid resources.

The Commonwealth next contends that to construe the second clause of § 40 as the trial judge did would unduly limit the liability of referring physicians, rendering liable only those whose referrals to providers resulted in the providers' billing Medicaid for their services. Otherwise put, the referring physicians' liability would turn not on their own actions but on the happenstance of whether the billing providers actually submit bills for the services they have rendered. In urging this, the Commonwealth appears to ignore the first clause of § 40 and fails to read both clauses together. The first clause, requiring proof of an actual claim, permits prosecution of the fraudulent billing provider,

---

[23]Before the 2000 amendment, G. L. c. 118E, § 46A, provided that a Medicaid provider "*procuring a payment*" under the program in violation of pertinent statutory provisions would, nonetheless, "not be considered in violation . . . upon submission of proof . . . that *such violation* was due solely to a clerical or administrative error" (emphasis added). See St. 1993, c. 161, § 17. The wording changes in the 2000 amendment are minor, and they do not alter our analysis.

i.e., the person who submits the claim. The second clause, on the other hand, allows the Commonwealth to bypass the billing provider in order to prosecute the fraudulent referring provider, thereby shielding the innocent billing provider who renders services in good faith in reliance on a referring provider's falsities. The Commonwealth's emphasis on the reliance placed in the health care system upon referrals among providers is not disserved by requiring proof of an actual submission to Medicaid in order to establish liability under either the first or second clause of § 40. To the contrary, each clause so construed furthers the principal aim of G. L. c. 118E, § 40, by targeting different actors in the referral network.[24]

In light of this, we discern neither error nor abuse of discretion in the judge's allowance of a new trial. In the event that the Commonwealth elects to bring to trial again the two Medicaid fraud counts predicated on the psychological testing, we presume, as the trial judge apparently did, that it will have additional evidence establishing the actual submission of claims to Medicaid.

*Conclusion.* The judgment as to illegal prescribing in violation of G. L. c. 94C, § 32B(*a*), is reversed, the verdict is set aside, and judgment shall enter for the defendant. The order allowing the motion for new trial on the two convictions for Medicaid fraud, G. L. c. 118E, § 40, is affirmed.

*So ordered.*

---

[24]The Commonwealth's reliance on *Commonwealth* v. *Pike*, 430 Mass. at 322-323, for aid in construing G. L. c. 118E, § 40, is misplaced. The court there engaged in no substantive discussion of § 40 and, as important, the subject claims under § 40 had actually been submitted to Medicaid.

The Commonwealth also calls our attention to other State and Federal statutes, but does not suggest in any meaningful way how, if at all, they might support its position. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).